No. 769.

## L. A. WEBRE VS. WILLIAM WILTON.

In a contest for an elective office all of the relevant facts of the election will be scrutinized by the court, and all legal evidence tending to show who was the real choice of the suffragans, or who *would* have been, under an honest execution of the election laws, is admissible.

Except when the prescription of an election-law is that a thing shall be done in a certain way, and not otherwise, it will be construed as merely directory.

The disregard of a merely directory provision in an election-law, will not invalidate an election held under that law, if such disregard has not admitted the votes of disqualified, nor excluded the votes of qualified voters, nor clothed the result of the election in doubt.

The failure to return the result of a certain poll, within the time prescribed by law, does not of itself authorize the rejection of the vote of that poll.

Votes fraudulently cast, and those of disqualified persons, must be rejected.

Votes cast at a place clandestinely selected by a supervisor of election, and inconveniently remote from the polling-place legally fixed, and published, must be excluded from the count.

The object of all laws regulating elections is under our system to secure the great end of carrying out the popular will; and courts of justice will interpret them so as to secure and not to defeat that end.

A fundamental principle of American and Louisiana law is, that it is the casting of the ballots, unimpeded by force or fraud, which determines the result of elections. The police regulations made to secure that result are merely subsidiary to it.

It is in the power of no officer or set of officers to substitute their own will for that of the people, and whenever it is attempted, it is the duty of the courts, when properly appealed to, not only to enter upon the inquiry, but to undo the wrong and award the right.

APPEAL from the Fifteenth Judicial District Court, parish of Lafourche. *Beattie,* J.

*Clay Knobloch, J. S. Billiu,* and *Isaiah D. Moore,* for plaintiff and appellant.

*W. J. Q. Baker,* for defendant.

The opinion of the court was delivered by

EGAN, J. This is a contest for office. The plaintiff claims to have received a majority of the votes cast for the office of sheriff of the parish

of Lafourche at the general election in November last, and that he was legally elected sheriff at said election; but that, notwithstanding, his opponent, the present defendant, who was defeated at the polls, he fears and alleges will be returned elected and put in possession and enjoyment of the office and its emoluments through fraud and other ill-practices on the part of the supervisor of registration, the commissioners of election, and other officers and persons. There are numerous other allegations, and these frauds and irregularities are set out in numerous specifications, some of which are general and some more minute and particular. Among them are that the supervisor, a Republican, opposed in politics to petitioner and his party, failed to give public and general notice of the polling-places and the names of commissioners; that he failed to appoint Democratic commissioners at any of the voting-places as required by law, although professing to so intend and to have done so; that he informed the Republicans of the location of the polling-places several days before the election, and concealed them from the Democrats until twenty-four hours before the election, too late to notify the people in the country in a parish ninety miles long and many parts of which are otherwise accessible slowly and with difficulty; that he issued false and fraudulent certificates of registration, upon which persons voted at the election; that he repeatedly promised and as often failed to strike from the registration list, when called upon to do so, the names of voters who had died, who had removed from the parish, who were convicts, minors, or otherwise not qualified to vote; that votes were polled under the names and numbers of such dead or removed voters by other persons in sufficient numbers, together with the other frauds and illegalities charged, to change the count of votes to his prejudice; that the supervisor did not provide tally-sheets, sealing-wax, writing-material, etc., necessary for the use of the commissioners at Democratic polls, and did not even send ballot-boxes to some of them; of which failure and fault he attempted to and did subsequently take advantage, to the prejudice of the petitioner; that he failed to appoint any polling-place in one of the justice's wards, as required by law, where there were at least forty or fifty Democratic votes, of which petitioner was deprived in the election thereby; that one poll (seventeen) was not held at the place fixed by law and the supervisor, but at a place one and a half or two miles distant, in a private place, a negro quarter, remote from the public road, and without notice to the Democrats, or even to those of them residing on the plantation, or even to the proprietor; that the election at that poll, seventeen, was begun before daylight in the morning, was conducted exclusively by Republican commissioners and against the protest of the United States supervisor of registration, and of Democratic voters, who, after the election had been going on for some time, discovered by accident

where it was being conducted, but refused to vote at an illegal voting-place for fear of losing their votes; that said poll seventeen as returned was exclusively Republican, and was returned and counted as such and in favor of the defendant and against the plaintiff to the number of eighty-six votes; that a large number of colored voters, who desired to vote and would have voted for petitioner and the Democratic ticket, were prevented from doing so by intimidation and fraud; that there were many other acts of fraud and illegality on the part of the supervisor, the commissioners of election, and other Republicans, whereby it was attempted to defeat the will of the people and the election of the petitioner and to declare his opponent elected, when not so in fact; that the supervisor illegally and fraudulently rejected and refused to compile or count the votes from two polling-places (Nos. 2 and 10), at both of which the election was conducted fairly and peacefully, and at which petitioner and the Democratic ticket received a large majority of the votes polled, sufficient, if counted, to have given the return of the election in his favor and against the defendant; and, finally, that by means of the several frauds, illegalities, and ill-practices charged petitioner and the Democratic ticket generally will be illegally deprived of a majority in the count, compilation, and return of the votes of the parish of Lafourche, which, as he alleges, was and always had been a Democratic parish, by a large majority, and was so at the late election.

It is proved that, after conference with Republican leaders, at which he was asked if he could carry the parish for the Republicans, and *he replied that he would do what he could,* one Ledet, a Republican, was appointed supervisor of registration in the place of Panalle, an honest colored Republican, who was called upon to resign under pretexts the falsity of which is shown. From the moment of his appointment Ledet lent himself to the fraudulent purposes of his party and those to whom he owed his appointment, and in every way possible endeavored to prevent a fair election in the parish, and the polling of the full Democratic vote, instead of discharging his duty under the law as a public officer.

The record is full of details of the most unblushing usurpations, frauds, deceits, and other ill-practices and illegal acts resorted to by the Republican supervisor and his associates and advisers in order to carry the parish in favor of the Republican ticket and against the Democratic ticket and the plaintiff, and to make count and compilation and return of the votes in the same way.

These things had grown so common and were habitually practiced with such immunity under the recent rule in Louisiana that they excite no surprise in the mind of any one familiar with the history and conduct of elections in this State for the last few years. Such practices on the part of those charged with the conduct of elections has latterly been

Webre vs. Wilton,

a stepping-stone to preferment and fortune, instead of consigning their authors to a just punishment. Under pretext of preserving the purity and freedom of elections, the whole machinery for their management had become converted into a means of defeating the popular will, instead of carrying it out, and as a means of keeping in place and power a set of corrupt men whose sole object was personal advancement by any and all means, however vile, and not the public good.

The district judge has exhibited his learning and research to show the enormity of the offenses committed by those who sought to guard against these frauds and ill-practices and to detect and expose them when committed. The acts themselves which provoked this espionage, as he terms it, and their authors have been passed over by him in silence. They seem to have provoked from him neither censure nor remark. It may be very true, as remarked by him, that the ballot should be kept sacred and secret. That such is the general design of the law is beyond question; but, while severely censuring those citizens of standing and character (as shown by the evidence) who were engaged in the enforced effort to prevent or expose fraud and illegal voting and practices, it seems entirely to have escaped the district judge that the means of removing from the ballot the veil of secrecy was afforded by those who, for their own purposes and in order to prevent freedom and independence in voting, had placed such marks upon their tickets and those of their political friends, and had made them so distinguishable that not only was it impossible for the ignorant and easily-intimidated colored voter to escape detection if he attempted to vote for his white Democratic friends in whose capacity and fair-dealing he had confidence, but that the most ordinary observer could readily distinguish the character and political complexion of the ballots. Those who voted such tickets did so with full knowledge of the object, and must be considered as having given their consent to the exposure of their votes, so that by all authority no objection could attach to proof of the fact.

That an independent record of the names of voters should have been kept by the United States supervisor was simply the performance of a legal duty, and if that record could be made a check, as it was designed to be, upon corrupt officials whose habitual practice it was to use, as in this case, the police regulations for the conduct of elections as a means of defeating their ends, it is hardly a warrant for the severity of the censure in which it pleased the district judge to indulge in his opinion in this case.

It seems to us a misuse of the eminent authority from which he quotes, and one against which those from whom he quotes would protest, to make them, instead of a protection to the independence of the individual voter, *a means of defeating the will of the body of voters!*

There are not wanting among the utterances of those eminent judges and authors others to the effect that the whole object of all laws regulating elections is, under our American system, to secure the great end of carrying out the popular will, and the fact that contests for office are provided for by law presupposes, what has always been practiced in such cases, an inquiry and the introduction of evidence as to who rightfully obtained or would have obtained at a legal, fair, and peaceful election a majority of the votes. 12 An. 239, 366; 13 An. 301; 27 An. 507. How can this be done without proving, by any legal evidence, for whom the suffragans cast their votes?

A fundamental principle of American and Louisiana law is that it is the casting of the votes or ballots, unimpeded by force or fraud, which determines with us the result of elections. The laws, the police regulations, which are or should be always framed to secure fair elections and a fair polling, count, and report of the votes, are merely subsidiary to that end, and, while they should be observed and considered, they are of themselves of far less importance than the end to be attained. It is in the power of no officer or set of officers to substitute their own will for the votes and will of the people, and wherever this has been done it is the duty of the courts where properly appealed to not only to enter upon the inquiry, but to award the right and undo the wrong, and, if need be, to punish the guilty.

In Auld vs. Walton, 12 An. 139, the language of the court is: "The sovereign in this land is the people, and the ballot the expression of the sovereign will. The audacious criminal who lays the hand of violence (and, we may add, fraud) upon the ballot-box in effect usurps the sovereignty of the country. Whenever, therefore, a case of such attempted usurpation is presented, the tribunals charged with the jurisdiction of contested elections should avail themselves *of every legal means* within their reach to ascertain whether the popular will has been expressed through the ballot-box; and, if so, what it has decreed."

There is an essential difference between the act of voting and the police provisions to secure the evidence of the act. The principle that if the votes be deposited the object of the election is attained, and its validity can not be affected by the non-observance of the directory provisions of the law, has been often disregarded in Louisiana of late years, as it was in this instance. But these principles are well settled in the jurisprudence of our sister States and our own, and have been recognized and announced by the courts, not only as constituted before the war, but by our immediate predecessors in the case of Burton vs. Hicks, 27 An. 507. See 9 An. 577; 10 An. 732; 13 An. 301; 8 N. S. 67; 14 Barb. 259; Cooley's Const. Lim. 618. The same author says, page 625: "It is to be constantly borne in mind that the point of inquiry is the will of the electors as manifested by their ballots."

Webro vs. Wilton.

The various provisions of the statute under which the election of November last was held, however often they have been misinterpreted or disregarded, were by their terms and declared intent simply designed to protect and keep pure the ballot and secure its legitimate results. On the subject of the conduct of elections Judge Cooley says (Const. Lim., pages 617 and 618): " Election statutes are to be tested like other statutes, but with a leaning to liberality in view of the great public purposes which they accomplish; and, except where they specially provide that a thing shall be done in the manner indicated, *and not otherwise, their provisions, designed merely for the information and guidance of the officers, must be regarded as directory only;* and the election will not be defeated by a failure to comply with them, provided the irregularity has not hindered any who were entitled, from exercising the right of suffrage or rendered doubtful the evidences from which the result was to be declared." Again the author says, page 618, referring to the leading case of People vs. Cook, 14 Barb. 259: " It was said in the same case that any irregularity in conducting an election, which does not deprive a legal voter of his vote, *or admit a disqualified voter* to vote, or cast uncertainty on the result, and has not been occasioned by the agency of a party seeking to derive a benefit from it, should be overlooked in a proceeding to try the right to an office depending on such election."· Of this the author says: " This rule is an eminently proper one, and *it furnishes a very satisfactory test as to what is essential and what is not* in election laws." In note (1), page 618, Cooley says: " In *ex parte* Heath, 3 Hill, 42, it was held that where the statute required the inspectors to certify the result of the election *on the next day thereafter,* or sooner, the certificate made *the second day thereafter was sufficient,* the statute, as *to time,* being directory merely." By this we understand the time for making up and returning the votes and complying with other directory provisions of the law, and not the time at which the election shall be held.

Let us apply these principles to the facts of the case at bar:

We have already referred in general terms to the evidence of acts of omission and commission on the part of the officers of election, and, more especially, the supervisor, which in the light of his declarations and conduct before and after the election, and his evidence on the trial of this case, can not but be viewed as done with fraudulent intent to carry or declare the result of the election adversely to plaintiff and the Democratic ticket generally. He admits a white majority of at least two hundred in the parish, and there is evidence that he stated after the election that Judge Beattie was the only Republican elected in the parish. He permitted or procured another person, a political partisan, to write up his tabulated return, and then indifferently signed it, giving the election against plaintiff and the Democratic ticket.

It is proven that there was no polling-place established in the eighth justice's ward; that there was no box or other means of holding an election at poll one, a white or Democratic poll, and that voters came and went away without voting or the opportunity to vote, although two commissioners and the United States supervisor state that they went there at five in the morning and remained till six in the evening; that the supervisor did not sign or send out the appointments of Democratic commissioners; that he promised repeatedly, and as often failed, to strike from the registry the names of dead men, persons removed from the parish, infamous by reason of conviction for crime, minors, and others not legal voters; and that a number of persons voted under these names and numbers for the Republican candidates; that others voted twice; that others voted under names and numbers not their own; that sufficient notice of the polling-places was not given to the Democrats, and was given to the Republicans; that the Democrats were refused their proper and legal representation in the appointment of commissioners of election, and that poll No. 17, at which the Republican candidates, including the defendant, got the entire vote, eighty-six in number, was removed surreptitiously, and without the knowledge of the Democrats, to a place other than that which the supervisor had appointed at their instance, and which was suitable and public, and the poll was actually opened and the election held at a place distant at least one mile from the proper one, against the protest of a few Democrats, who discovered the fact after the election had been proceeded with for a considerable length of time and many votes had been received. All these, and many other details which we can not enumerate, and the refusal to receive and count polls two and ten without sufficient legal reason, are, we think, sufficiently shown by the evidence in the record.

Returns from poll two were received but not counted, because not received within twenty-four hours after the election. There is not a particle of evidence in the record to show that the returns from this poll were other than an accurate report of the ballots cast, or that the election at that box was not perfectly peaceful and fair. On the contrary, it is shown affirmatively that it was so, and the district judge so states in his opinion. This poll gave the plaintiff 139 votes and the defendant 103, being a majority of thirty-six for plaintiff. Under the authorities cited, this box should have been, and must now be, counted, and so thought the district judge.

Poll No. 10 was held forty miles away from the court-house. The commissioners' count (and there were here, as elsewhere, none but Republicans) was completed, according to the testimony of one of them, Hutton, of O'Sullivan, United States supervisor, and of Joseph Legarde, about eleven or twelve o'clock at night. O'Sullivan testifies that he then

" told Frustal that he must, as State commissioner, take the box to Thibodaux. He positively refused to do so, saying that he had no means of transportation. The same excuse was given by the other commissioners." Legarde swears that "after the votes were counted he and O'Sullivan started off; they 'hollowed' at us when we got at the door to stop, that we had to bring the box. Mr. O'Sullivan answered them he would not take it unless some of the commissioners would come with him. Mr. Frustal said he had passed the night before (he was one of the commissioners) *to find out where the poll was*, and that he would not pass another night. The other commissioner, Hutton, said the same thing, and they decided to send a constable with us who was there. I offered one of them my place in the buggy with Mr. O'Sullivan, and I would stay down there. They told me they would not come." Hutton, one of the Republican commissioners, testifies:

"The votes were counted and the box was sealed, and the box was delivered to the constable and Mr. O'Sullivan. I delivered the box to the Republican constable (whose name he gives as Levi White) and to Mr. O'Sullivan; the reason why we commissioners did not come up is because we had no conveyance to come up; and again I say that the election went on peaceably. My signature to poll ten is genuine. Mr. Frustal also signed it in my presence. Levi White and Lindsey Ingram also signed it in my presence."

In answer to a question by the court, this witness says: "The statement which I signed said Mr. Webre received 171 votes; that is about correct."

The same witness said: "Mr. Wilton received 44, 54, or 64 votes, I do not recollect. The vote for the other contestants was about the same, according to the best of my recollection; the Democratic majority at that box was about 125 majority." The written returns in evidence—the correctness of which is testified to by the other witnesses, and which were compared with the tally-sheets and ballots by experts, appointed in the court below—show the vote at this box ten to have been, for Webre 171, for Wilton 44, being a majority for plaintiff of 127 votes," thus showing how nearly it corresponds with the memory and statement of the Republican commissioner and witness for the defense, Hutton. The genuineness of the return and of the signatures of the three Republican commissioners to it is also shown by other witnesses; and there is no evidence that it was not correctly made. On the contrary, it is confirmed, as we have stated, by the report of experts; and it is further proved that the box was placed in the buggy of O'Sullivan at eleven or twelve o'clock at night; that they traveled all night to get to Thibodaux, only stopping a short time to get some refreshment on the way, and that the box was never out of custody of the Republican constable till

they arrived and offered to deliver it to Ledet, the Republican supervisor, about eight or half-past eight o'clock the next morning after the election. Ledet refused to receive the box, because, as he said at the time, it was not brought in by the commissioners, and it did not contain the returns. See testimony of O'Sullivan and Legarde, the latter of whom says the box was then placed in the hands of the clerk of the court. O'Sullivan says that he suspected that something was going to be attempted at this poll, from the fact that the supervisor had not supplied writing material, wax, etc., and that about 8:30 on the morning of the election a young colored man, who said he was one of the constables for that poll, arrived with an empty box at the polling-place. Legarde swears that this second box remained there all day; and O'Sullivan swears that these suspicions and the refusal of the commissioners to carry up the box made him determine that he would see it was properly returned. His vigilance alone, no doubt, defeated the purpose of the supervisor, Ledet, and of the Republican commissioners, that either another box should be substituted for the true one, or that no return should be made from this strong Democratic box. The fact that they found themselves unable to make this substitution, no doubt, determined them not to return the box at all, and when Ledet found, notwithstanding all their prearrangements to the contrary, that the true returns had been brought up under the eye of O'Sullivan, the United States supervisor, he determined not to receive them. This is the most reasonable conclusion from the evidence.

We omitted to state that a witness, Schmidt, and another, Comeaux, detail a conversation among some of the Republican officials and others in the clerk's office, in which apprehension was expressed that box ten would beat the Republicans except Beattie; and the subject of fixing the box to prevent that result was canvassed among them.

The district judge thought that this box ten should be counted, and so think we. That, as we have seen, gives the plaintiff 171 votes, and the defendant 44, a majority for plaintiff of 127 votes. By the return of the supervisor, without boxes two and ten, the defendant received a total of 1872 votes and the plaintiff of 1685 ; add the votes of the rejected polls, and the total vote of the defendant stands 2019, and of the plaintiff 1995, leaving a majority for the defendant upon a count of all the polls at which elections were held of twenty-four votes in the parish. In this computation we agree with the district judge also. He made a further deduction of six votes, which he thought it was proved that plaintiff had lost in ward eight, owing to no poll being opened there, and one minor and one convict, who had voted illegally, making eight. This, according to the district judge, reduced defendant's majority to sixteen. The plaintiff claims, we think correctly, to have proved that at least

thirty-six illegal and fraudulent votes were received for the Republican ticket, including the defendant, at different polls. We are satisfied there were a sufficient number to change the result. This fact is proved by several respectable witnesses, by the names and numbers under which persons voted fraudulently, and is supported by the general tenor of the testimony. The district judge thought it was not shown with sufficient clearness. The tabulated statements and direct testimony of witnesses, all of which are very minute and circumstantial, afford the best evidence possible in a case of so flagrant fraud, and we think it sufficient. These were composed of one minor and one convict, some who did not live in the parish, some who had not been sufficiently long in the State to acquire the right to vote, some who had voted twice, some who had voted under false or duplicate certificates, and some who had voted under the names and numbers of other persons, some of whom are proved to have been dead at the time. These facts taken in connection with the refusal of the supervisor to erase from the registry names which had no proper place there, and the well-known fact that at the last election there was unusual interest and effort on the part of the Democrats over the State, the fact shown in evidence that there was a registered white or Democratic majority in the parish of about two hundred votes, and the facts shown by the testimony, among which is that of Steinberg, himself a Republican, that "the parish of Lafourche has given Democratic majorities ever since the election of April, 1868," and that on the trial of this case the Republican supervisor Ledet himself admitted while on the stand that he had said to Judge Beattie that "if Darrell, the Republican candidate for Congress, did not give me (him) a place in the customhouse, I would come out and tell what advantages we Republicans had taken in the parish of Lafourche," and it will be impossible in the light of the other facts of similar character for any impartial mind to arrive at any other conclusion than that either the election in the parish of Lafourche in November last was really carried by the plaintiff and for the Democratic ticket, and a false return made, or that owing to fraud and other illegalities on the part of the Republicans, and especially of the officers conducting the election, there was no legal and valid election.

The district judge quotes the authority of Auld vs. Walton, 12 An. 141, for the position that the decision of the register of voters is a kind of judgment, and that the commissioners could not go behind his certificate. Even if that be correct, upon which we express no opinion, in the next paragraph of the opinion in the same case the court says further : " We do not hold, however, the judgments of that tribunal to be without appeal. The ninth section of the act—referring to the act to provide a registry for the parish of Orleans—provides a mode of redress by suit

against the register for an applicant to whom the register shall refuse a certificate. And *the validity of the certificate and the sufficiency of the proof upon which it is based may in all cases be examined* upon a contest of election by the tribunals seized of the jurisdiction of such contest."

We will now consider the facts connected with the election at poll seventeen, which gave to the defendant and to the Republican ticket, as returned, eighty-six votes, and none to the Democrats, and which plaintiff claims should be altogether rejected for several reasons, among which is that it was not held at the place fixed by law and the supervisor, but that without warrant of law and with intent to defraud the plaintiff, the election was held at a place away from the public road, and distant some two miles from that fixed by law and the supervisor. The district judge testified that "two days before the election the plaintiff, Webre, showed him that at several places the polls had been fixed at the quarters, back from the public road. I insisted that they should be placed upon the public road. Mr. Ledet demurred, saying it was too late to change, and that the change would give the Democrats the advantage. I told him that was a matter of opinion in which I differed with both the Democrats and Republican managers, *but that it did* not look right, and that the change must and should be made. I recollect that one of the polls was fixed for the quarters or sugar-house on the Dixie plantation, belonging to my wife. I insisted that this should be changed to the warehouse on the public road. *Mr. Ledet agreed to make these changes. On the Sunday preceding the election, in the afternoon, I understood that the changes had been made."*

Other witnesses testify that they were made, at least as to poll seventeen, and a list of polling-places which appears in the ward, and which the record shows was published after the change, fixes the place for holding the election at poll seventeen *at the warehouse on the public road,* which is proved to be at a distance of not less than one mile from the place where the election was held. It is proved that shortly before the time for opening the polls, Mr. Billieu, United States supervisor, Mr. Gilmore, and Mr. Allen, the proprietor of the warehouse and plantation, went to the warehouse.

Allen testifies: "I was at home on the Rienzi plantation on the day of the last election, in November, 1876. I understood that the poll was to be held at my warehouse on the front of my plantation. I got up very early in the morning, I understood that the poll was to be opened at six o'clock, for the purpose of opening the warehouse or the pump-mill, which is just adjoining at a distance of about thirty yards from the warehouse. When I went there there was no person there. I waited an hour, I suppose, and finally Mr. Gilmore arrived, who, I understood, was

one of the commissioners to hold the election. We-two waited for a while, and Mr. Gilmore rode to the quarters to see if he could hear any thing of the election. He reported to me that they were holding the election in the quarters. I then went down and protested against the election being held there. After my protest they kept on holding the election there. I had no idea that the poll was to be held at the quarters; it was a perfect surprise to me."

Gilmore says: "I got up very early in the morning, before the time for opening the poll, *and went up to the place where notice of election said the poll of election* was to be opened, at the warehouse of Mr. R. H. Allen. I there met Mr. Billieu, United States commissioner, I believe. We remained some time, until after the hour when the poll ought to have been opened, and I then borrowed Mr. Billieu's horse and rode on to the other precinct, to see if any thing wrong had happened; Mr. Billieu was to remain to see if any one was going to come and open the poll. I then returned and found Mr. Billieu gone. In a short time I saw Mr. Allen, who was looking for the poll. After requesting Mr. Allen to remain there, I went toward the quarters to see if I could find Mr. Billieu. When I got there I found them holding the election in one of the houses in the quarters, and Mr. Billieu was there. I told the parties holding the election that notice was stuck up that the election was to be held at the warehouse on the public road. I objected to the poll being held there, and filed a written protest with the commissioner. He answered, '*that they were instructed* to hold the election in the quarters, and that they were going to hold it there.'"

This witness says he then left and went elsewhere and voted, but that he was put to inconvenience to do so, and that there were some Democrats who would not go to the same inconvenience to vote.

Richard Burton says: "I am manager of the Allen plantation. The poll was located at an unusual place, remote from the public road, where the general public, passing back and forth on the public road, could not see it. The establishment of the poll at that spot was done so clandestinely that the white Democrats residing on the plantation knew nothing of it until the day of election."

M. W. Billieu says: "Was Democratic supervisor at poll seventeen; repaired to the warehouse, where it should have been held, in front on the public road; waited till after six o'clock, the time for opening the poll. I learned by chance that it had been opened at the quarters on the Allen plantation, about one mile from the public road. I went down there and found the poll opened, and the voting going on *under the supervision of three Republican* commissioners, one white and two colored. I demanded of the white commissioner what he meant by such arbitrary and unjust proceedings, and was answered that he was acting under instructions.

I remonstrated with him, and that night entered a written protest against the reception of the box from that poll by the supervisor of election, Mr. Ledet."

This protest is in evidence. He further states: "Poll seventeen, as shown in the printed poster, is located at Allen's warehouse. It is like all the other posters I saw posted. It is a correct list as published and posted by M. A. Ledet, supervisor."

Lawson Banks, sworn, says: "I am a colored man, aged fifty years; I am a carpenter and wheelwright; have been working for forty years on Mr. R. H. Allen's plantation; was on that plantation on the day of election; the poll was opened in a room in the quarters once occupied by Buck Payne; I *do not know at what hour of the night the poll was opened, but when I was called up* I went to the poll that morning and believe the poll was opened before six o'clock; I *could not at that time recognize a man the length of the room, it being so dark.*"

William Black, sworn, says: "Am a colored man forty years old; have been working on Mr. Allen's place since I could as a laborer; was on the plantation the day of election; I could not tell *what time I got up; I got up before day;* the poll was held in a house called Buck Payne in the quarters; *when I found that the box was there I could only discern daybreak;* I did not know until that morning that the poll was to be held at the quarters; *I thought it was going to be held at the front gate at the warehouse on the public road.*"

Without proceeding further with this already lengthy review of testimony, it is enough to say that the record can make no other impression upon any impartial mind than that this poll was not only held at a private place, not the polling-place fixed or published according to law, and too remote from it to be pretended to be a substantial compliance with the law, which is intended for the convenience of all voters, but also that this change was made surreptitiously and with a view to defraud in the interest of the defendant and his political friends, and against that of the plaintiff and his political friends.

Cooley's Const. Lim., p. 619, says: "Time *and place*, however, are of the substance of every election, and a failure to comply with the law in these particulars is not generally to be treated as a venial irregularity." In a note on the same page he cites Commonwealth vs. County Commissioners, 5 Rawle, 75, to the effect that an election adjourned without warrant to another place, as well as an election held without officers required by law, is void. We are also referred by plaintiff's counsel to an authority not in our reach at this place of session, McCrary on Elections, p. 86, No. 115, where, the counsel say it was held that "adjourning a poll from a school-house to a vacant lot half a mile off is void," and other cases are said to be there cited in support of this position. We

Webre vs. Wilton.

regret that we have not now access to them and other authorities bearing upon this important question. The reason of the rule invoked is, however, very manifest, and the circumstances attending the removal of poll seventeen from the place fixed by law to another and unauthorized place make it the more manifest. The object of the change is proved to have been to take unlawful advantage of political adversaries; in other words, to defraud the law and *prevent a fair, full, and independent* expression of the popular will. Courts can not lend their aid to such a purpose. It was no more legal to hold an election where it was held, and to return it as that from poll seventeen, than it was to hold it at *any other time* than *that fixed by law*. It is well settled that can not be done. There was no election held at poll seventeen in the parish of Lafourche on the seventh of November last. We have been unable to find, and have been referred to no case, where votes cast under such circumstances have been counted to determine an election. Our conclusion, therefore, is, that what purports to be the return of this poll should not be counted or considered in determining the result of the election. This, of itself, is sufficient to give to the plaintiff, Webre, a clear majority of the votes, and, when considered in connection with the evidence of illegal and fraudulent votes received by his opponent, and which must be, considered as not cast, and with the cutting off of votes from the plaintiff to which he was entitled, and which he would have received had the election been legally and fairly conducted, makes it impossible that the defendant should retain the office in any event; and, in view of all the facts of the case, we are of opinion that, upon a fair and legal count of all the legal votes given, the plaintiff received a majority.

It is also shown by Republican testimony that there was much intimidation of the colored voters by Republicans, and none of any class by Democrats. The supervisor, Ledet, himself swore on the trial below that he did not establish any voting precinct in the eighth justice's ward, as required by law; that the people there had always been Democrats, to his knowledge; that if deprived of their full vote, the party and the contestants had lost thirty or forty votes; that "many of them were poor people, who had no means or facilities to travel to other polls to vote." He says, further: "There is a majority of whites of about two hundred in the parish, and I think if we had not taken the advantages that we have the parish might have gone Democratic."

We think, on the whole case, that the evidence does establish that the illegal acts and matters complained of by the plaintiff did materially affect the result of the election, and that that result was not truly declared by those whose duty it was to do so.

The district judge thought the petition was not specific enough in its allegations. The evidence has supplied any defect of allegation.

We have been consoled in the protracted examination and review of this record of official corruption and deliberate fraud upon the most sacred rights of the people by the reflection that this case may serve as a warning for the future for the same people to guard more sacredly than ever the palladium of their liberties, and with that view, to provide, if need be, by law, and also by the elevation of public morals, against the possibility of the repetition of such acts. It may also serve to teach the immediate wrong-doers and all who have sought to profit by their acts, that there is still left a means of redress and a portal on which is written, " *Procul, O procul este, profani!*"

It is therefore ordered, adjudged, and decreed that the judgment of the lower court be annulled, avoided, and reversed, and that the plaintiff, L. A. Webre, be and he is hereby declared to have been duly elected sheriff of the parish of Lafourche at the general election on the seventh of November last, 1876, and that he is entitled to the fees and emoluments of said office. It is further ordered and decreed that said plaintiff, Webre, be inducted into his said office, and that the defendant and appellee pay the costs of both courts.

We append, as part of this opinion and decree a computation of the vote according to the views announced therein:

|  |  | Votes. |
|---|---|---|
| According to the supervisor's return defendant, Wilton, received |  | 1872 |
| Deduct for poll seventeen | 86 |  |
| For other illegal votes | 36— | 122 |
| Leaves |  | 1750 |
| Add vote at poll two |  | 103 |
| Add vote at poll ten |  | 44 |
| Makes a total of |  | 1897 |
| According to the supervisor's return plaintiff, Webre, received |  | ·1685 |
| Add vote at poll two |  | 139· |
| Add vote at poll ten |  | 171 |
| Makes total for Webre of |  | 1995· |
| Deduct Wilton's vote |  | 1897 |
| Leaves Webre a majority of |  | 98· |

without reference to six votes computed for him from ward eight by the district judge or any greater number proved.

---

ON APPLICATION FOR REHEARING.

MANNING, C. J. It is rightly remarked by the counsel for the defendant, in his brief supporting the application for a rehearing: " The great

underlying principle in all contested election cases is to ascertain the will of the majority." The problem is to secure first to the voter a free and untrammeled vote; and, secondly, a correct record and return of the vote, and that in all cases, it is incumbent on the contestant to shew that the acts of which he complains changed the result.

And we will add, if the acts of which a contestant complains do not change the result, courts will not intervene, though the conduct of the one or the other may be tainted by fraud, or vitiated by violence. For of what concern is it to judicial tribunals to learn what bad and illegal acts either candidate may have been guilty of, if one received so large a majority over the other that he is elected, notwithstanding the deduction from his poll of all the votes that should not have been received nor counted.

But when the case is otherwise—when the object and purpose of the officials who have the machinery of elections in charge is shown by testimony to have been, not the ascertainment of the will of the majority, but the perversion of the expression of that will; not a correct record and return of the vote, but such a return as accomplishes a predetermined result; not an untrammeled vote, but so to trammel it by cunning devices that the suffragan has been deceived or misled—then it is the highest office and the most imperative duty of a court to vindicate the purity and inviolability of the ballot, and to take care that the republic, whose corner-stone is the vote of the citizen, shall receive no harm.

For the fundamental principle of every representative government is that it is not the return, but the *election*, that entitles a party to an office. Hence it has been uniformly held that the official return of an election is only *prima facie* evidence of its legality and correctness, and that a court can go behind it to ascertain the true state of the vote. If this were not so, why should the intricate forms for registration be prescribed, or why the necessity of the voter personally offering his vote, or offering it at all, if a power rested anywhere to disregard every thing that had been done at the ballot-box, and elect at the returning-board. The act of casting a vote is not to the citizen an empty form. It is the lever by which the majority raises itself to the summit of the government, and there controls, orders, executes.

Ledet, as supervisor of registration for Lafourche parish, made return of the election, and impeached the truth of his return by his testimony on the trial. We are reminded, in the brief for the rehearing, of Lord Mansfield's declaration, that "it is of consequence to mankind that no man shall hang out false colors to deceive them by first affixing his signature to a paper, and afterward giving his testimony to invalidate it."

But that great jurist would not have felt himself precluded, by the enunciation of this wise maxim, from receiving the testimony of a .

40

criminal who had become the State's witness against his fellows.   And in a civil action where the public interests are involved, as in a contested election suit, more than the interests of the individuals who are parties thereto, it is no infringement of that principle to hear from him who hung out the false colors the story of the manner in which they were fashioned, and his intent in displaying them.

Nor is it Ledet alone who details the circumstances preceding and attending this election.   Other witnesses, who are reputable citizens, inform us that when notice was given of the election that was to be held, no indication was made of the places where it would be held, nor was this necessary information supplied publicly until twenty-four hours before the time for opening the polls.   This delay or omission might have been attributed perhaps to negligence or forgetfulness, but for the fact, of which the evidence leaves no room for doubt, that information of the location of the polling-places was early given to one of the political parties, and was withheld from the other.   The record shows that on the sixth of November the supervisor, Ledet, published for the first time what he termed "a correct revised list of polling-places to be opened on the seventh throughout the parish for the convenience of the electors of Lafourche."

. The acts complained of by the plaintiff, and which changed the result, are reviewed *in extenso* in the opinion read by my brother Egan, and we are constrained to say there is too apparent to be unobserved or disregarded a design to thwart rather than promote a fair expression of the popular will by the officers who supervised this election.   And this design, the first indication of which is afforded by the omission to give publicity to essential preliminaries, is developed more audaciously as the election-day approaches, and .culminates in excluding from the return two boxes which the judge of the lower court demonstrates should have been counted.

The return of the supervisor, or registrar, which excluded polls two and ten, was thus:

SUPERVISOR'S RETURN.

Wilton's vote.................................................1872

Webre's vote...............................................1685

Wilton's majority........................................ 187

The district judge properly regarded this return as evidence only that *prima facie* it was correct, but admitted testimony and testified himself of matters, the object and effect of which was to impugn its correctness.   He revised this official return, counted the votes of the two rejected polls, and also counted six votes for Webre which were not cast for him, but which the judge believed from the evidence would have

been cast for him, if the voters had not been prevented from voting. He also deducted two votes from Wilton which he thought were improperly received.

### DISTRICT JUDGE'S COUNT.

| | |
|---|---:|
| Wilton's vote by supervisor's return............................. | 1872 |
| Wilton's vote at poll two........................................ | 103 |
| Wilton's vote at poll ten........................................ | 44 |
| | 2019 |
| Deduct votes.................................................... | 2 |
| | 2017 |

| | | |
|---|---:|---:|
| Webre's vote by supervisor's return...................... | 1685 | |
| Webre's vote at poll two.................................. | 139 | |
| Webre's vote at poll ten.................................. | 171 | |
| Add votes he would have received.................:.... | 6— | 2001 |
| Wilton's majority......................................... | | 16 |

We do not count for Webre any vote that was not actually cast for him, nor do we reject any vote for Wilton that was cast for him, except poll seventeen, and thirty-six votes which are part of a larger number that Webre alleged were improperly received. The lists, made part of his petition, comprised one hundred and nine names, of whom eleven voted on dead men's papers, eight were convicts, four were persons who had removed from the parish, twenty-three voted twice on that day, and sixty-three voted on fraudulent certificates. The proof satisfied the lower court that two of this number should be rejected. It satisfies us that thirty-six of them should certainly be rejected.

### THE CORRECT COUNT.

| | |
|---|---:|
| Webre's vote per supervisor's return............................. | 1685 |
| Webre's vote at poll two........................................ | 139 |
| Webre's vote at poll ten........................................ | 171 |
| | 1995 |

| | | |
|---|---:|---:|
| Wilton's vote per supervisor's return...................... | 1872 | |
| Wilton's vote at poll two.................................. | 103 | |
| Wilton's vote at poll ten.................................. | 44 | |
| | 2019 | |
| Deduct poll seventeen...............................86 | | |
| Deduct fraudulent votes.............................36— | 122— | 1897 |
| Webre's majority......................................... | | 98 |

The counsel for the defendant urges strenuously for a rehearing upon

the erroneous rejection of poll seventeen. If we should concede to the defendant all the votes at that poll, and follow the example of the court *a qua* in counting those votes for Webre that he would have received at ward eight if an election had been held there, it would not change the result. The court below counted for Webre six votes, as if they had been given him at that poll, though in fact no poll was opened there. But if we are to take that poll into account at all, the evidence establishes a larger number. One set of witnesses say that Webre would have received forty or fifty votes at that poll if it had been opened. The other set say he would have received thirty or forty votes if it had been opened. Give him the smallest number, and count poll seventeen for his adversary:

Webre's vote *ut supra*........................................ 1995
Add votes for box eight....................................... 30
                                                            ————
                                                            2025
Wilton's vote *ut supra* .....................................1897
Add poll seventeen.....  ..................................... 86 ·
                                                          ——— 1983
                                                            ————
   Webre's majority............................................ 42

A careful review of our first opinion, and a re-examination of the record, leave upon our minds no doubt of the correctness of our former decree.

Rehearing refused.