PROVOSTY, J.
The validity of a special election held in a drainage district for the voting of a tax and the issue of bonds is contested in this case by taxpayers of the district, on two grounds:
First, that the notice of the election was not published for full 30 days as was necessary ; and, second, that the vote of Mr. R. R. Barrow, which changed the result of the election, was cast before the time fixed by the statute for the opening of the poll, and before any one of the commissioners of election had reached the polling place.
The notice of the election was required to be published “in the official journal of the parish.” Section 2, Act No. 145, p. 250, Acts 1902. This “official journal” appeared only every Saturday. Hence a publication in this journal every Saturday was sufficient. The election was held 32 days after the first publication, and during that time the notice was published every Saturday. This was clearly a full compliance with the law.
Interpreting Act No. 104, p. 157, of 1878, providing for judicial advertisements in the parish of Orleans, this court has held that a publication “once a week” is sufficient (In re City of New Orleans, 52 La. Ann. 1073, 27 South. 592) ; and that it may be on any day of the week, so long as it precedes the sale (In re Lindner, 113 La. 772, 37 South. 720). Quoting these decisions, the learned counsel for plaintiffs argue that “there must be a publication once a week, during the weeks embraced within 30 full days, and the last publication must precede the election.” As we understand this contention, it is that the • statute under which the publication was made,, in the- instant case, divides off the 30 days into weeks and requires one of the publications to appear within each one of these weeks. In answer to this argument, *524 it suffices to say that the statute does nothing of the kind. All that it requires is that the notice “shall he published for 30 days in the official journal of the parish.”
Mr. Barrow was the president of the drainage district. He was anxious to vote, but was also anxious to catch an early train. When he reached the polling place, no one was there. Being pressed for time, he started 'out in search of the commissioners, instead of waiting for therp to arrive. Commissioner Aycock, whom he met, could not come immediately, as he had to go to his house and change clothes. While he was with Aycock, Mr. Theriot came along, having the ballot boxes in charge. He and Theriot drove back to the polling place, and found there Boudreaux and Duplantis. These two and Theriot at once opened the poll as commissioners, and Mr. Barrow voted before the hour fixed by law for the opening of the poll. The vote changed the result of the election.
Neither Theriot, Boudreaux, nor Duplantis was a commissioner. Boudreaux was the clerk of election. Theriot had been appointed commissioner, but had subsequently been appointed deputy sheriff for the poll, and since it was he who carried the ballot boxes, a function of the sheriff, and since he signed the election returns as deputy sheriff, we infer that he had accepted the appointment, thereby renouncing and vacating his appointment as commissioner. Duplantis was a mere bystander. Later the two commissioners, Aycock and Caillouet, appointed him commissioner in the place vacated by Theriot.
Barrow, as president of the drainage district had appointed the commissioners; but he had made the appointment by simply directing the secretary of the drainage board to appoint the same list of commissioners the president of the police jury had appointed for the election for public officers to be held at the same time and place.
The evidence leaves no doubt that the entire proceeding was in the best of good faith. Had any one challenged the vote on the grounds now urged, the probability is that Mr. Barrow, rather than jeopardize his vote, would have waited the two or three minutes until the commissioners and the time for opening the poll had arrived.
Under these circumstances, the learned judge a quo held the vote was good. We regret we cannot agree with him. His decision is founded on two well-recognized principles : First, that in the absence of fraud the courts are disposed to give effect to elections where possible (Webre v. Wilton, 29 La. Ann. 610) ; and, second, that the acts of de facto officers are valid (Cooley, Const. Lim. [6th Ed.] pp. 750, 777).
But the latter of these principles does not apply to the facts of the case, and the former, if stretched to the cracking point, cannot manufacture a vote; and that is what would have to be done in this case before this so-called vote of Mr. Barrow could be counted. Of itself it is not a vote.
Before there can be a vote there must be an election, and it stands to reason that the act of three bystanders in opening a so-called poll at a time not appointed by law for the holding of an election is not an election. Boudreaux, Theriot, and Duplantis had no better quality to act as commissioners than any other bystanders would have had; and the time fixed by law for the holding of the election had not yet arrived. The time had not arrived for holding an election; and there were no officers qualified to hold an election. Hence there was no election, and, as a consequence, no vote.
Time may not be so very sacramental that, in the absence of fraud, the election would be vitiated if-the commissioners anticipated by a trifle the hour fixed by law for the opening of the poll. Their official character would give a legal color to their act. But, *525 when bystanders Undertake to anticipate the time fixed by law for holding the election, there is nothing in the situation from which even a color of legality can be derived, unless, indeed, it be from the mere presence of the ballot boxes and election paper.
But, conceding, for argument, that even in such a case a vote cast by a voter who in good faith supposed the election to be going on regularly would be good, under the principle of the validity of the act of de facto officers, still the vote of Mr. Barrow is not good.
In the first place, there can be no de facto commissioner of election at a time not fixed by law for the holding of an election, on the principle that there Cannot be a de facto officer unless there is a corresponding office in existence. A. & E. E. of Law, vol. 8, p. 799.
In the second place, for the purpose of Mr. Barrow’s voting, the three gentlemen in question were not officers de facto for the further reason that Mr. Barrow knew, or must be held to have known, that they were not the commissioners.
A de facto officer is defined in the A. & E. E. of Law, vol. 8, p. 781, as follows:
“A fuller definition has been given by Chief Justice Butler as follows: ‘An officer de facto is one whose acts, though not those of a lawful officer, the law, upon principles of policy and justice, will hold valid so far as they involve the interests of the public and third persons, where the duties of the office were exercised, first, without a known appointment or election, but under such circumstances of reputation or acquiescence as were calculated to induce people, without inquiry, to submit to or invoke his action, supposing him to be the officer he assumed to be; second, under color of a known and valid appointment or election, but where the officer had failed to conform to some precedent requirement or condition, as to take an oath, give a bond, or the like; third, under color of a known election or appointment, void because the officer was not eligible, or because there was a want of power in the electing or appointing body, or by reason of some defect or irregularity in its exercise, such ineligibility, want of power, or defect being unknown to the public; fourth, under color of an election or appointment by or pursuant to a public unconstitutional law, before the same is adjudged to be such.’ ”
Of the reasons here given why the acts of a de facto officer are upheld, the only one that can have any possible application to this case is the first, namely, that the commissioners were acting “under such circumstances of reputation and acquiescence as were calculated to induce” Mr. Barrow “without inquiry to submit to or invoke” their “action, supposing” them “to be the officers they assumed to be.” Now, this reason is obviously inapplicable to a case where the person “induced to act without inquiry”' happens to be the very person charged by law with the appointment of the officer. Plainly, to apply the principle to such a case would be stretching it beyond the cracking point. Not only this, but it is very far from being made out that Mr. Barrow “supposed” the three gentlemen in question to be the commissioners. From the fact that, instead of waiting for them to appear, he had started out in search of them, the inference would be that he knew who they were. He certainly knew that Aycock and Theriot had been appointed commissioners, and the inference is very strong that he knew who the third commissioner was; and that inference is much strengthened by his refusal on the witness stand to disclaim his having had such knowledge. To the question whether he knew who the commissioners were he answered: “At that time, I don’t know. I might have known at that time.” The vote should have been rejected.
It is therefore ordered, adjudged, and decreed that the judgment appealed from be set aside, and that there be judgment in favor of the petitioners in the suit and against the defendants the police jury of the parish of Terrebonne and the board of commissioners of the Third drainage district of said parish, declaring the election held on the 19th day of April, 1904, to take the census of the *526 properly taxpayers of the'Third drainage district on the two propositions submitted to them by said board, to have been and to be null and void and of no effect, and that the result of the said election as declared be set aside and annulled, and that the defendants pay the costs of this suit