44 So.2d 826

**MELANCON v. MIZELL et al.**

No. 39219.

Jan. 9, 1950.

Rehearing Denied Feb. 13, 1950.

Ott & Richardson, Bogalusa, for plain-tiff.

Ernest A. Carrere, Jr., and Edward F. Stauss, Jr., New Orleans, for defendant and appellee.

HAMITER, Justice.

A writ of certiorari, issued to the Court of Appeal of the First Circuit on the ap-plication of plaintiff brings this contro-versy before us for review.

The suit was instituted against Floyd M. Mizell, a termite control operator licensed by the Louisiana Pest Control Commission, and also against the Western Casualty & Surety Company, the surety on the named operator's bond given pursuant to the provisions of Act 124 of 1942, to re-cover damages allegedly sustained by the plaintiff as a result of Mizell's nonper-formance of a termite contract.

Service of process on Mizell was never made. The surety, after receiving cita-tion, tendered exceptions of no right and no cause of action. These were sustained by the district court and the suit, as to the exceptor, was dismissed. On an appeal to the Court of Appeal the judgment was af-firmed, 37 So.2d 52.

■ For the purpose of passing upon the exceptions the well pleaded allegations of fact of the original and supplemental petitions, together with the recitals of the annexed documents, must be accepted as correct. These disclose a factual situa-tion as follows: On January 25, 1947, plaintiff, Aynaud Melancon, contracted in writing to purchase, for a cash considera-tion of $11,000, the home of Lyman Mat-tox and his wife located near Bogalusa. The contract provided, among other things that "Termite inspection is to be made, and if conditions are not found satisfactory agreement must be made to remedy condi-tion." In keeping with that provision,

Mattox, on the same date, entered into a written agreement respecting the house with defendant Mizell who obligated himself, in consideration of $160 cash paid to him, "to eradicate all subterranean termites therein and all non-subterranean termites in open construction therein, during a period of two years from date hereof * * *," the work to be commenced on January 27, 1947, and completed without delay. Also contained in Mizell's agreement were provisions reading: "Termite contract transferrable on change of owner * * * termite proof and inspect regularly * * * no repairs needed."

Previously Mizell had applied for, and had obtained from the Louisiana Pest Control Commission (created by Act 124 of 1942), a license to engage in the profession of termite control and eradication; and in connection therewith he had furnished the bond to which reference is made in the following extract from the rules and regulations adopted by such commission: "The applicant must furnish to the Chairman of the Commission a surety or fidelity bond in the amount of Two Thousand ($2,000.-00) Dollars (on forms to be furnished by the Commission), as a guarantee to faithfully and honestly engage in the professions of entomology, termite eradication, control and eradication of household insects, fumigation, or rodent control, and to carry out all contracts entered into."

The bond so furnished bears date of September 19, 1946, was signed by Mizell

as principal and the Western Casualty & Surety Company as surety, and was approved for the Commission by its then Chairman, Harry D. Wilson. In part it states:

"Whereas, under the provisions of Section 6 of said Act [Act 124 of 1942], all applicants for licenses to carry on such work are required to execute a bond in the aforesaid amount conditioned, respectively, upon their honestly conducting said business; and

"Whereas, Section 7 of said Act requires that each pest control operator licensed thereunder shall enter into a written contract with the property holder employing him to control or eradicate termites, in which such contract the pest control operator shall guarantee for a period of two (2) years the performance of the terms of said contract;

"Now therefore, the conditions of this obligation are such, That, if the said Floyd Monroe Mizell, Principal herein, shall honestly conduct said business; shall enter into written contracts with all property holders employing him to control or eradicate termites, in which contracts he shall guarantee for a period of two (2) years the performance of the terms thereof; *and shall perform such contracts in all their terms and provisions,* including the guarantee clause thereof, then this obligation shall be null and void; otherwise, to remain in full force and effect.

"The term of this bond shall be from July 1st, 1946, to July 1st, 1948, and same shall cover all liability, according to its terms, incurred by the said Principal under any contracts entered into by him during the aforesaid period, in his capacity as a pest control operator conducting business under the terms and provisions of said Act 124 of 1942." (Italics and brackets ours.)

Relying upon the written agreement between Mizell and Mattox (particularly the statement therein that no repairs were needed), and having concluded that the house had been or would be promptly freed of termites, plaintiff on January 29, 1947, consummated his purchase of the Mattox property by paying the cash consideration of $11,000 and receiving a deed evidencing his title. Shortly thereafter, upon taking possession of the premises, he found that the house was heavily infested with termites. Whereupon he notified Mizell of his finding and demanded that the condition be remedied in accordance with the termite contract. Mizell failed to satisfy the complaint in any manner, even refusing to return and inspect the premises.

Because of the presence of the termites extensive repairs to the house were necessary. Also, plaintiff was required to retain the services of another operator in order to properly treat the building and eradicate the termites.

In praying for a solidary judgment against Mizell and the defendant surety, awarding damages in the sum of $865.56, plaintiff makes the following additional allegations: "Your petitioner further avers that the said Mizell was guilty of gross negligence in complying with the provisions of the contract entered into by him, as aforesaid, in the following respects: in failing to properly inspect the premises and to ascertain the extent of the infestation of said building with termites even though such infestation could have been easily ascertained had a proper inspection been made; by failing to use the proper materials and methods in exterminating termites from said building; by failing to disclose to your petitioner the true condition of the building as a result of the infestation with termites; by misleading your petitioner into believing that the house was free of termites and no repairs were needed; by the failure of the said Mizell to remedy the condition of the business after this condition was called to his attention and repeated demands made upon him to correct same."

From the pleadings it does not appear that Mizell is charged by plaintiff with fraudulent practices in causing the damages for which judgment is sought. True, he alleges that the assertion that no repairs were needed misled him into believing that the house was free of termites. But this allegation does not disclose an intention on the part of Mizell to mislead or defraud; in fact it is found under and in connection with the general accusation of gross negligence. Plaintiff's action, as we

appreciate it, is predicated on the theory that Mizell breached his contract by failing to faithfully perform the work which he undertook and guaranteed to do; and that, by reason of such failure of performance, his surety under the bond given pursuant to Act 124 of 1942, is liable for the resulting damages. The Court of Appeal considered that to be the theory of the action, and the following extract from the brief of plaintiff's counsel further indicates that it is: "The petition filed herein shows a contract and a guarantee of the work, and the obligation of the defendant insurance company for the faithful performance of the contract. If plaintiff can prove what he alleges he has a cause of action against the insurance company, and the exception of no cause or right of action should be overruled."

As shown above, and in accordance with the rules and regulations of the Pest Control Commission, Mizell's bond is expressly conditioned on the performance of his contracts in all their terms and provisions. However, defense counsel contend, and the Court of Appeal held, that since the bond is purely statutory and Act 124 of 1942 (under which it was given) stipulates for it (in Section 6) only the condition that the principal shall honestly conduct his business, the provision relating to the performance of contracts was improperly required by the Commission and erroneously contained therein. Hence, the question presented for determination is whether the bond's controverted provision or condition (assuming the bond to be purely statutory) is authorized by Act 124 of 1942.

In approaching this question we consider first the history and development of that statute. The initial legislation in this state on the subject of pest control and eradication was Act 57 of 1930, the object of which, as stated in its title, was to regulate the practice of entomological, pathological and tree surgery work, and to prevent fraudulent practices in those professional services. To that end the 1930 statute, in Section 1, created a Horticultural Commission, composed of the Commissioner of Agriculture and Immigration, the State Entomologist and the Director of Extension; and it granted to that Commission power to make rules and regulations to govern the qualifications of those conducting such professional services and to prevent fraudulent practices. An applicant for a license to engage in the work was required (under Section 4) to furnish a $500 bond, payable to the Chairman of the Commission, to insure his honestly conducting the business.

The Court of Appeal of the Second Circuit considered the 1930 statute in Anders v. J. L. Evans & Company, Inc., 1938, 187 So. 109, and held that the bond therein required was not to guarantee the faithful performance of contracts, but that it purposed to insure the conducting of a business free of fraud or fraudulent practices in dealing with others. Unquestionably

that holding was correct in view of the expressed object of the statute, it being, according to the title, to "prevent fraudulent practices in the professional work herein defined."

Act 141 of 1936 furnished the next legislation on the subject. Except in a few particulars it was identical with the 1930 statute. Thus, the title stated that it was " * * * to prevent fraudulent practices in the professional work herein defined;" it included the same professional services; and it likewise empowered the Horticultural Commission (composed of the members named in the 1930 Act and two additional ones) to make rules and regulations to prevent fraudulent practices. However, it added two new services (Horticultural and Floricultural), each of which was to have representation on the Commission; and it made provision for the licensee's furnishing a bond not to exceed $10,000, conditioned on his honestly conducting the business, if in the judgment of the Commission it was necessary (the 1930 statute, as shown above, recited a $500 mandatory bond).

The case of Parkerson et al. v. Home Protection Service, Inc., et al., 1945, 24 So.2d 256, 258, decided by the Court of Appeal of the First Circuit by a two to one vote and in which a writ of certiorari was denied by this court, involved an action on two bonds given by a termite control operator during the effective period of the 1936 statute. One of the bonds contained only the condition that the principal would honestly conduct the business of termite control and declared that it was given in accordance with Act 141 of 1936. As to this bond the majority opinion observed: " * * * If this were the only bond signed by the surety company and declared on in the case, it is obvious that the case of Anders v. Evans Company, supra, would be applicable and decisive of the case as the situation would be almost exactly the same as it was in the cited case. * * *"

The other bond in the Parkerson case, however, was conditioned on the principal's faithful performance of contracts entered into by him which guaranteed his professional services for a period of two years, all as required by the rules and regulations of the Horticultural Commission. With reference to this bond the majority opinion stated: "Regardless of the question of whether or not the Commission had the right to pass the regulation requiring a person engaged in the profession of termite control and guaranteeing his services to give a bond for the faithful performance of such a contract, it remains a fact that both the termite company and the surety company complied with the regulation and made it possible for the termite company to hold out to plaintiff and actually put into its contract with him the statement to the effect that the work to be done under the contract was guaranteed for a period of two years in accordance with the bond on file with the Commission. The termite

company paid a premium to the surety company annually to keep this bond in force, and the surety company cannot now be permitted to escape liability on this bond on which it collected the premiums and under which it voluntarily bound itself."

From this statement, as well as other comments in the majority opinion, it is apparent that the liability of the defendant surety was determined on the basis of the recitals of the contract and bond, not on the provisions of the 1936 statute.

Act 124 of 1942, with the provisions of which we are directly concerned in the instant case, differs materially from the preceding two statutes. The title discloses, among other things, that it is an Act "To create a Pest Control Commission; to define its duties and powers; * * * to provide for the issuance and revocation of licenses and to make rules and regulations setting forth qualifications and conditions under which licenses may be issued; and the supervision and inspection of pest control work; *to require bond for the faithful and honest performance of such work; to require the same to be done under written contract containing a guarantee;* * * *." The emphasized portions, it is important to notice, were not contained in the titles of the preceding legislation. Nor is the provision found in those titles: "* * * to prevent fraudulent practices in the professional work herein defined", contained in the instant title. (Italics ours.)

In Section 1 of the 1942 statute, after the creation of the Pest Control Commission, it is said that the Commission "is hereby authorized to make and issue licenses for each particular type of pest control work in accordance with rules prescribed by a majority of the said Commission, and the said Commission is hereby authorized to make rules and regulations covering the qualifications of applicants; * * *."

Other pertinent provisions of the 1942 statute are those contained in Sections 6 and 7, reading:

"Section 6. Before said Commission shall issue a license to any pest control operator, he must first furnish to said Commission a surety or fidelity bond in the amount of $2,000.00, of tenor and solvency satisfactory to a majority of said Commission; and the condition of said bond shall be that the principal therein named shall honestly conduct said business; said bond shall be filed and recorded in the office of said Commission. A certified copy of said bond shall be received as evidence in all of the Courts of this State without further proof. Any person having a right or cause of action against said principal, may enter suit against said principal and sureties of said bond. Said bond shall be kept in full force and effect as long as the principal thereon remains engaged in pest control or eradication work, and failure to so keep same in effect shall require forfeiture and revocation of said principal's license by the said Pest Control Commission.

"Section 7. Every licensed pest control operator shall enter into a written contract with the property holder employing him to control or eradicate termites, in which he shall guarantee for a period of two years the performance of the terms of his contract. Failure to execute such a contract or failure to carry out said guarantee shall subject such operator to forfeiture of his license by the Pest Control Commission and to a fine of not less than $50.00 nor more than $200.00, or to imprisonment for not less than 30 days nor more than 90 days, or both in the discretion of the Court."

As to these provisions it may be pointed out that the stipulated condition (in Section 6) for the bond, i. e., that the principal shall honestly conduct said business, is practically the same as the condition for the bonds referred to in the prior legislation. Neither of the former statutes, however, required (as does the quoted Section 7) that the operator shall guarantee in writing, for a period of two years, the performance of the terms of his contracts.

Having discussed the history and development of Act 124 of 1942, we return to the specific question presented by this litigation. To repeat, it is whether the obligation of the defendant surety respecting the performance of Mizell's contracts, which it expressly undertook on executing the bond, is authorized by the provisions of the 1942 statute.

When considered alone the condition for the bond announced in Section 6 of the 1942 statute perhaps might imply only an assurance that the business will not be carried on in a fraudulent manner, because the word "honest" ordinarily is used as meaning free of fraud or deception. Further, it may be said that such an implication could not be successfully disputed if the title and other provisions of the statute disclosed a purpose, as did the previous legislation, of merely preventing fraudulent practices in the professional services affected. The use of the word "honest", however, is not always so restricted. Sometimes it is employed as meaning just, equitable, trustworthy, truthful, upright, sincere, all of which are listed in the definition given for "honest" in Webster's New International Dictionary, Second Edition. And it is possible that the Legislature in said Section 6 used the words "honestly conduct said business" in a broad sense, intending thereby (as it might well have done in view of the mentioned definition) not only to prevent fraudulent practices but also to insure a just and sincere carrying out of the work undertaken by the business. Especially is this so when it is recalled that the expressed purpose of the former legislation of preventing fraudulent practices was not reiterated in the title of the instant statute.

In interpreting a statutory provision it should be construed along with the remainder of the statute and in connection

with all laws on the same subject matter. Moreover, the object that the Legislature had in view should be ascertained, and the interpretation adopted which best harmonizes with that object and the statute's context. Thibaut v. Board of Commissioners of Lafourche Basin Levee District, 153 La. 501, 96 So. 47; State ex rel. Lyons v. Democratic State Central Committee, 165 La. 531, 115 So. 740; Pepsodent Company v. Krauss Company, 200 La. 959, 9 So.2d 303. To determine that object, where doubt exists, the title of a statute may be considered, although it cannot be used in enlarging the text. Succession of Baker, 129 La. 74, 55 So. 714, Ann.Cas. 1912D, 1181; Schimpf v. Thomas, Sheriff, 204 La. 541, 15 So.2d 880.

■ In applying these principles we notice first that Section 1 of the 1942 statute vests the Pest Control Commission with almost unlimited rule making power respecting the work under its supervision; at least the granted authority is not restricted, as it was in the former legislation, to the making of rules and regulations "to prevent fraudulent practices." Further, we observe that Section 7, contrary to the previous legislation, requires every licensed operator to guarantee for a period of two years, under a written contract, the performance of the terms of his contracts. These two provisions and the mentioned circumstances (the granting of almost unrestricted rule-making power to the Commission and the requirement of a written

guarantee of performance, neither of which the former statutes contained) are indicative of an intention of the Legislature that the bond prescribed by Section 6, as well as the entire statute, has for its purpose both the preventing of fraudulent practices by an operator and the insuring of performance of his contracts. And this intention is conclusively disclosed by the title of the Act when, in announcing the object and purpose of the present legislation, it specifically states: " * * * to require bond for the faithful and honest performance of such work."

Incidentally, the defendant surety so interpreted the statute, for the bond given on behalf of Mizell is thus conditioned. Of course, the rules and regulations of the Commission required those conditions in the bond; nevertheless, such defendant could have refused to sign it.

The fact that Section 7 of the 1942 statute subjects the operator to a criminal penalty and to a forfeiture of his license on his failure to execute a written contract or to fulfill his guarantee does not, in our opinion, militate against the found legislative intent. Thereby the Legislature was merely providing additional means for the enforcement of the provisions of the Act.

■ Since Act 124 of 1942 authorizes the controverted condition contained in Mizell's bond that he shall perform his contract and, further, since plaintiff has sufficiently alleged failure of performance, we hold that the assailed pleadings state

both a right and a cause of action against the defendant surety. The question respecting the kind and amount of damages plaintiff is entitled to recover is one which addresses itself to the merits of the case.

For the reasons assigned the judgments of the district court and the Court of Appeal are reversed and set aside, the exceptions of no right and no cause of action are now overruled, and the case is remanded to the district court to be proceeded with according to law and consistent with the views herein expressed. Appellee shall pay the costs of this appeal, while all other costs shall await the final determination of the litigation.

PONDER, J., dissents.

Le BLANC, J., takes no part.

McCALEB, Judge (concurring).

The bond in suit is unquestionably a statutory bond. Therefore, as correctly held by the Court of Appeal (see 37 So.2d 52), the statute must be read into the bond; superadded stipulations must be disregarded and necessary conditions must be supplied. Davis v. West Louisiana Bank, 155 La. 245, 99 So. 207 and Murphy Iron Works v. United States Fidelity & Guaranty Co., 169 La. 163, 124 So. 768.

Section 6 of Act 124 of 1942 declares "* * * the condition of said bond shall be that the principal therein named shall honestly conduct said business; * * *". This language is perfectly explicit. Hence, there is no room for interpretation. Article 13 of the Civil Code. Notwithstanding this, the majority, under the guise of construction, resolve that the legislature intended "* * * that the bond prescribed by Section 6, as well as the entire statute, has for its purpose both the preventing of fraudulent practices by an operator and the insuring of performance of his contracts." In concluding thus, the court has rewritten Section 6 and converted the fidelity bond therein provided for into a guaranty bond.

On the other hand, it is my view that the Court of Appeal erred in upholding the exception of no cause of action for it is alleged in the petition that Mizell, the operator, misled plaintiff into believing that the house was free of termites and that no repairs were needed. This allegation indicates, to my mind, a deceitful [1] act on the part of Mizell which is sufficient to state a cause of action against his surety.

The bond required by the statute is a fidelity bond. Under the jurisprudence such a bond, indemnifying against loss by any act of "fraud" or "dishonesty", is ordinarily held to extend beyond acts which

1. Webster's New International Dictionary (1931 Ed.) defines the word "mislead"—"To lead into a wrong way or path; to lead astray; to guide into error; to cause to err or mistake; to deceive."

are criminal; albeit, the words are given a broad significance and are construed most strongly against the insurer. See 50 Am.Jur. Verbo "Suretyship" Section 335. Any act disclosing an absence of integrity or fair dealing may be within the meaning of such a bond. Idem; see also annotation 98 A.L.R. 1264 and cases there cited.

For these reasons, I respectfully concur in the decree.