SIMON, Justice.
 

 As duly qualified voters and property owners in Sewerage District No. 2 of the Parish of Caddo, Louisiana, plaintiffs instituted this action to have declared null, void and of no effect a special bond and tax election held on April 25, 1959, in said district, a political subdivision of this State duly created by Ordinance of the Police Jury of Caddo Parish, adopted September 11, 1958, its creation being in full compliance with the provisions of Article XIV, Section 14(c), of the State Constitution, LSA, and LSA-R.S. 33:3881-33:3890, inclusive. The numbered statutes appear under the title of Sewerage Systems or Districts outside municipalities, the pertinent parts of which are hereinafter referred to. In compliance therewith, particularly LSA-R.S. 33:3887, said ordinance also appointed three property taxpayers residing within the District to function as the Board of Supervisors of said Sewerage District, and as such, to be the governing authority thereof.
 

 Following their appointment the Board of Supervisors met and organized on the date and at the time specified in said Ordinance; and it is conceded that said Board has continuously officiated as the governing authority of the District in all of its legal and administrative affairs. After complying with all legal requirements the Board of Supervisors ordered the calling and holding of an election in said District to obtain the consent or disapproval of the property owners, both in sufficient numbers and assessed valuation, in the proposed issuance of ad valorem tax bonds totalling $85,000 for the announced purpose of constructing, maintaining and operating sewerage disposal works, title to which would vest in the public.
 

 Following the holding of the election on April 25, 1959, the Board of Supervisors met at the closing of the polls, and as the governing authority, opened the ballot box, counted the ballots in number and amount, canvassed the returns and declared the results. The minutes of the Board reflecting all matters in connection therewith were duly published in the official journal of the District.
 

 
 *847
 
 In contesting the legality of said election, plaintiffs assert:
 

 (1) That LSA-R.S. 39:503, which requires only four publications of the notice of the special election, violates Article XIV, Section 14(a) of the Constitution;
 

 (2) That the Board of Supervisors had no right, power or authority to order or hold said election, since the Police Jury of the Parish of Caddo is legally the governing authority of the Sewerage District;
 

 (3) That alleged irregularities nullify the election; and
 

 (4) That the amount of tax bonds voted exceeds the debt limitation fixed by Article XIV, Section 14(f), of the Constitution.
 

 Pursuant to a rule initiated by plaintiffs, the lower court ordered the opening of the ballot box used in the election, and it is conclusively shown that the recount commissioners, after viewing all ballots in the presence of the judge, found the election to have carried in both number and amount.
 

 On the merits judgment was rendered declaring the election null, void and of no effect. In so decreeing the district judge concluded that LSA-R.S. 39:471 was not repealed by Acts 494 and 495 of the Legislature of 1952, and that since LSA-R.S. 39:471 specifically designated the Police Jury of the Parish as the governing authority of sewerage districts for the calling of a tax bond election, the Board of Supervisors of the District possessed no legal right to do so.
 

 From this judgment defendant has appealed.
 

 It is the contention of defendant-appellant that the two above-numbered statutes of 1952 (Acts 494-495) clearly repealed LSA-R.S. 39:471 insofar as the governing authority of parochial sewerage districts is concerned, and specifically designate the Board of Supervisors as the legal governing authority for all purposes.
 

 On the other hand, plaintiffs rely on the conclusions announced by the lower court contending that the two statutes (LSA-R.S. 39:471 and Act 495 of 1952) are not inconsistent or irreconcilable, urging that the subject matter of each is separable from the other. In the alternative, they argue that if the two statutes cannot be reconciled that the adoption of Act 495 of 1952 did not work a legal repeal of LSA-R.S. 39:471, but had the legal effect of amending the latter statute, changing only a part of it, and that as such the amendment does not conform to the provisions of Article III, Section 17, of the Constitution.
 
 [1]
 
 In answer to this appeal plaintiffs re-urge all of the charges contended for below and as above set forth, save and
 
 *849
 
 except the complaint that the votes were not legally counted and canvassed, which they now concede was properly done.
 

 It will now be noted that we have been favored with two scholarly briefs submitted amicus curiae by Sewerage District No. 1 of the Parish of Lafayette, Louisiana, and that of Sewerage District No. 1 of the Parish of St. Charles, Louisiana, which considered with the equally scholarly briefs of the litigants have been of material aid to us in resolving the issues presented.
 

 The primary or crucial question presented is whether the Police Jury of the Parish in which a sewerage district is or has been created, outside of municipal boundaries, is the legal governing authority of such sewerage district, or whether the Board of Supervisiors appointed for such district is the governing body thereof.
 

 To determine the main issue and whether there is an irreconcilable conflict between LSA-R.S. 39:471 and Act 495 of 1952 an examination of the applicable law is in order.
 

 Article XIV, Section 14(c), of our Constitution of 1921 provides that the Legislature :
 

 “ * * * may, by general law, and within the limitations and conditions herein contained, authorize sewerage districts,
 
 through the police jury of the parish, as the governing authority thereof,
 
 * * * to incur debt and in-sue negotiable bonds * * (Italics ours.)
 

 At the following extra session of the Legislature in 1921, enabling Act 46 was enacted to implement and carry into effect the afore-quoted constitutional article. This Act and Article XIV, Section 14, of the Constitution of 1921, became the embodiment of the entire law of the State at that time with respect to the incurring of debt and the issuing of tax bonds by parishes, municipalities and political subdivisions of the State, such as road, sewerage, fire protection, waterworks, gravity drainage, school, and hospital service districts, respectively. Therein was enumerated the corporate status, powers, governing authority and other
 
 [1]
 
 administrative powers and matters in regard to these subdivisions.
 

 In 1924 the Legislature enacted two Acts, Nos. 209 and 222. The latter was a complete statute authorizing the creation of sewerage districts outside the corporate' limits of municipalities, enumerating their corporate status and powers,
 
 naming the police jury as the governing authority,
 
 designating the officers of the district, and providing for the corporate seal, and other interrelated matters of administration. This Act was later incorporated in the Louisiana Revised Statutes of 1950.
 
 [2]
 
 Act 209 of 1924 was enacted amending Act 46 of 1921, supra, so as to designate, besides
 
 *851
 
 providing for administrative and other kindred matters, the police jury of the parish the governing authority of sewerage districts therein created outside of municipalities. The provisions of Act 46 of 1921 as thus amended was likewise incorporated in the Revised Statutes of 1950 as LSA-R.S. 39:471.
 
 [3]
 
 Title 39 is entitled and treats of “Public Finance” as well as “Local Finance.”
 

 In its 1952 session the Legislature proposed Act 494, an amendment to Section 14(c) of Article XIV, referred to above, and this amendment, being duly ratified by the electorate at an election held in November 1952 changed the wording of said constitutional section which formerly read “through the police jury of the parish, as the governing authority thereof, or through the governing body of such municipal corporation, as the case may be, to incur debt and issue negotiable bonds * * to read “ * * *
 
 through the governing authority thereof,
 
 to incur debt and issue negotiable bonds * * (Italics ours.) Manifestly, the sole purpose of so amending this constitutional provision was to delete the specific designation of the governing authority of sewerage districts and to leave to the Legislature the power of such designation.
 

 As a companion or enabling measure to the proposed constitutional amendment, supra, the Legislature of 1952 amended and re-enacted LSA-R.S. 33:3885-33 :38S9, added two new sections, Section 6 being-designated as LSA-R.S. 33:3890, and Section 7, providing that “this act shall become effective upon the approval by the electors of the constitutional amendment * * (Act 494 of 1952, supra, the proposed constitutional amendment.)
 

 A comparison of the provisions of LSA-R.S. 33 :3885-33:3889 with the provisions of the amending and re-enacting Act 495 of 1952 clearly evidences the exact and pointed changes effected as regards the governing authority of parochial sewerage districts.
 

 Firstly, LSA-R.S. 33:3885 originally provided that
 
 "Any parish, through its governing authority,”
 
 which undoubtedly signifies the police jury, shall adopt and enforce rules, regulations, and ordinances in the financial administration of sewerage districts. The amending statute (Act 495 of 1952) provides that “Any sewerage district, through its governing authority,” shall do and perform the acts above referred to. Obviously, this amendment would be meaningless unless its purport is to transfer such powers to the Board of
 
 *853
 
 Supervisors as defined in LSA-R.S. 33 3887, the amending Act.
 

 Secondly, LSA-R.S. 33:3886 originally designated the parish seat as the domicile, designated the official journal of the parish as the official journal of the District, and provided that the corporate seal of the police jury might be adopted as the corporate seal of the sewerage district. The amending statute, supra, enables the sewerage district to have a domicile, other than the parish seat, the latter the domicile of the police jury, provided for the designation of a fiscal agent by the governing authority of the sewerage district, and also provided that “The governing authority of the sewerage district shall
 
 at its first meeting,
 
 adopt an official seal * * * and shall designate the official journal thereof.” (Italics ours.) The phrase “at its first meeting” could not possibly refer other than to the Board of Supervisors as the governing authority. This re-enactment was obviously and effectively designed to divorce the government of a sewerage district in its administrative details from the police jury of a parish.
 

 Thirdly, prior to the amendment, 'the original act, supra, permitted the appointment of a “supervising board” with limited powers as an administrative agent of the police jury, with no authority to act except upon the approval of the police jury. The amending Act, supra, makes it mandatory upon the police jury to appoint a Board of Supervisors, and calls for an election of a chairman, vice-chairman and secretary-treasurer by the Board from their own members, removing the provisions which made the Board an agent of the police jury and creating an autonomous and independent political subdivision.
 

 Fourthly, the most informative provision of the amendment, supra, is contained in LSA-R.S. 33:3888, which originally provided that the officers of the police jury shall be the officers of the parochial sewerage district, and, as now amended, provides that:
 
 “The officers of the board of stipervisors shall be the officers of the
 
 district, *
 
 *
 
 *.” (Italics ours.)
 

 This key provision enunciates in plain terms that the officers comprising the Board of Supervisors shall be the officers of the sewerage district, and as such the governing authority thereof.
 

 Finally, the amendment provides, under LSA-R.S. 33 :3889, that the annual budget be prepared by the Board of Supervisors rather than by the police jury, as originally provided.
 

 LSA-R.S. 33 :3890 is a new section added by the amending statute, supra, which provides that “Within sixty days after July 30, 1952, the board of supervisors of any sewerage district heretofore created shall meet and reorganize in accordance with the provisions of this Sub-part, and such board
 
 *855
 
 shall thereafter be
 
 the governing authority
 
 of such district.” (Italics ours.)
 

 We again find the plain and unambiguous intent and purpose of the Legislature that the Board of Supervisors, and not the Police Jury, should thenceforth be the governing authority of sewerage districts, and which is confirmed by the provisions of LSA-R.S. 33:3891, the latter added by Act 118 of 1959, which provides a method whereby sewerage districts may be reorganized after the sixty-day time limitation fixed by the preceding section, supra. Although this new section post-dates the 1952 statute, the Legislative intention is made crystal clear, for it therein provides that such reorganized districts shall have the power “ * * * to issue bonds pursuant to appropriate proceedings therefor to be adopted by its board of supervisors, * * * ” purposely meaning, that as regards sewerage districts only one governing authority is contemplated, inescapably a substitution of the new for the old, both by the constitutional amendment and its companion enabling statute, supra.
 

 Hence, we must necessarily conclude that the provisions contained in LSA-R.S. 39 :471, supra, wherein the police jury of a parish is recognized as tire governing authority of a parochial sewerage district, is clearly contrary to and in irreconcilable conflict with the amendments effected by Act 495 of 1952 as hereinabove analyzed, and is, therefore, superceded and repealed to .the extent of such conflict.
 

 Though LSA-R.S. 39 :471 designates the governing authority of political subdivisions, including sewerage districts, such as road, drainage, hospital and other districts, and Act 495 of 1952, supra, deals exclusively with sewerage districts, our LSA-Civil Code, Article 22, declares: “Laws may be repealed either entirely or partially, by other laws.” Article 23 of the LSA-Civil Code declares:
 

 “The repeal is either express or implied:
 

 “It is express, when it is literally declared by a subsequent law;
 

 “It is implied, when the new law contains provisions contrary to, or irreconcilable with those of the former law.
 

 “The repeal of a repealing law does not revive the first law.”
 

 It must be observed that Section 8 of Act 495 of 1952 provides that “All laws or parts of laws in conflict herewith are hereby repealed,” thus expressing the unquestionable intent of the Legislature to abrogate the conflicting provisions of any law on the subject matter of parochial sewerage districts, and of necessity, LSA-R.S. 39:471. State ex rel. Martin v. Webster Parish School Board, 126 La. 392, 52 So. 553; Glassell, Taylor and Robinson v.
 
 *857
 
 John W. Harris Associates, 209 La. 957, 26 So.2d 1.
 

 The uniform jurisprudence is that all statutory provisions are to be given effect whenever possible. LSA-Civil Code, Art. 17; State v. Texas Co., 205 La. 417, 17 So.2d 569; Town of Abbeville v. Police Jury, 207 La. 779, 22 So.2d 62; Melancon v. Mizell, 216 La. 711, 44 So.2d 826. If statutes can be reconciled by a fair and reasonable interpretation, it must be done, since the repeal of a statute by implication is not favored nor to be indulged in if there is any other reasonable construction. Chappuis v. Reggie, 222 La. 35, 62 So.2d 92, and authorities therein cited.
 

 In construing the statute involved herein, it is necessary to ascertain the legislative intent; and the reason which induced the Legislature to enact it should be considered in determining its meaning. Courts will construe a statute so as to accomplish the purpose for which it was enacted and to give effect to the legislative will. Pepsodent Co. v. Krauss Co., 200 La. 959, 9 So.2d 303. It is also well recognized that where the obvious purpose of the law is to cover the whole subject matter therein dealt with, it supersedes all prior pertinent legislation. State v. St. Julian, 221 La. 1018, 61 So.2d 464.
 

 Our jurisprudence equally establishes the principle that in the field of statutory construction where statutes confer overlapping functions to two boards courts should not hesitate to apply the rule of repeal by implication. In the case of Mills v. City of Baton Rouge, 210 La. 830, 28 So.2d 447, 449, the city established a zoning and later a city planning commission under another legislative act. The latter statute provided that “where a city planning commission exists, it shall be the zoning commission.” Act No. 305 of 1926, § 3. When the two statutes came before us for review, we pointed out that it was evident that the powers, duties and functions of the two boards overlapped in some instances and in invalidating the first statute, we said:
 

 “This convinces us that it was never the intention of the Legislature that a municipality should have both of these hoards, with such overlapping powers and duties, functioning at one and the same time.”
 

 Thus, for us to give effect, as plaintiffs would have us do, to both Act 495 of 1952 and LSA-R.S. 39:471, with no guideposts as to where the authority of the board of supervisors ends and the authority of the police jury begins, would seriously jeopardize the public health and welfare, and render illusory the beneficent purposes of sewerage districts.
 

 Hence, the Legislature intended to and did in fact re-enact an all-embracing statute, supra, insofar as the whole subject mat
 
 *859
 
 ter of the administration of parochial sewerage districts are concerned, and in so doing transferred all functions of the governing authority from the police jury to the board of supervisors, thus in effect repealing LSA-R.S. 39:471 insofar as pertaining to such districts. The Board of Supervisors of Sewerage District No. 2 of the Parish of Caddo was therefore the proper and legal governing authority to call and hold the special bond and tax election therein on April 25, 1959, and to incur debt and issue negotiable bonds for the purpose of constructing and maintaining such sewers and sewerage disposal works as proposed and approved by the electorate of the District.
 

 Having reached this conclusion it is necessary for us to consider the other contentions asserted by plaintiffs.
 

 Plaintiffs aver that LSA-R.S. 39 :503 violates Article XIV, Section 14, of the Louisiana Constitution, because it does not provide for sufficient notice or publication of an election in that it permits four continuous publications in a newspaper once a week to constitute thirty days’ notice.
 

 Article XIV, Section 14(a), provides in part that the notice of election must be “published or posted for thirty (30) days
 
 in such manner as the Legislature may prescribe
 
 * * (Italics ours.) This constitutional provision was implemented by LSA-R.S. 39 :503, which reads:
 

 “Notice of the election shall be given embracing substantially all matters required to be set forth in the resolution ordering the election, and sjiall set forth further that the authorities ordering the election will, in open session, at an hour and place named, proceed to open the ballot boxes, canvass the returns and declare the result. The notice shall be published for thirty days in a newspaper published in the subdivision; or if there is no newspaper published therein, in a newspaper published in the parish; or if there is no newspaper published in the parish, in a newspaper published in an adjoining parish, and by posting in three public places in the subdivision ordering the election.
 
 Four publications in n newspaper once a week, shall constitute a publication for thirty days;
 
 provided thirty days intervene between the date of the first publication and the date of the election.” (Italics ours.)
 

 Plaintiffs do not allege that publication of the notice, as was done in the instant case, was violative of the above-quoted statute, but only that the statute is unconstitutional.
 

 The identical question was settled in 1915 in Henderson v. City of Shreveport, 137 La. 667, 69 So. 88, 89, 5 A.L.R. 516, in which the court disposed of the matter in the following language:
 

 
 *861
 
 “The interpretation of the language of the Constitution contended for by plaintiffs that the notice of election should be published for 30 days (that is for 30 consecutive days) might well render the constitutional right to make public improvements and to issue bonds therefor without effect in many places in the state * * *.
 

 “The question appears to be settled adversely to the position assumed by defendant in the decision of the cause entitled Lower Terrebonne Refining & Mfg. Co. v. Police Jury of Parish of Terrebonne, 115 La. 1019, 40 South. 443, 112 Am.St.Rep. 291. There the official journal of the parish of Terrebonne was published every Saturday, and the court held that a publication every Saturday during 30 days was sufficient.
 

 “There is no conflict between the constitutional provision and section 3 of Act No. 256 of 1910, quoted above. The act defines what a publication for 30 days consists of, and the Legislature had the right to interpret the Constitution.”
 

 The Terrebonne and Henderson cases were decided under the provisions of Article 281 of the Constitution of 1898 and 1913, respectively, said provisions reading substantially as follows in each Constitution :
 

 After due notice of said election has been published for thirty days in the official journal of the municipal corporation or parish or where there is no official journal, in a newspaper published therein.
 

 Plaintiffs observe that the constitutional provisions of 1921 differ in many respects from that of the Constitutions of 1898 and 1913. The latter had no provision for “posting notice,” but only for publication in a newspaper. On the other hand, we must be mindful of the fact that the present constitution directs that the notice shall be “in such manner as the Legislature may prescribe.” However, plaintiffs say that, conceding the correctness of the above-cited cases dealing with the legal sufficiency of notice under the earlier constitutions, a different construction is called for under the present. They argue that the rationale of the two cases, supra, dispensing with a continuous thirty-day notice for the assigned reason that no newspapers were published in many areas, is no longer sound. Further, they contend that if the Legislature is to be given full and absolute discretion to prescribe how long a time the notice shall be published, then it can be equally said that it is within the legislative power to prescribe that no notice shall constitute a publication for thirty days.
 

 Both of these contentions are without merit. It is just as true today as
 
 *863
 
 it was when these cases were decided that the Legislature has a right to interpret the Constitution, and, further, the constitutional article now directs the Legislature to prescribe the manner in which the notice of special election shall be published or posted, it being the duty of the court to determine the reasonableness of the Legislature’s action. The manner in which the Legislature has implemented the constitutional mandate in LSA-R.S. 39:503 is not only reasonable, but is also a practical necessity, it being well known that there are few parishes in the State in which a daily newspaper is published. The provision for posting was evidently added to be exercised in those parishes in which the medium of the press is unavailable. We may rightfully assume that if our constitutional framers in 1921 had disagreed with the cited cases, supra, Article XIV, Section 14(a), would have been worded to require that the notice be published for thirty
 
 consecutive
 
 days and with no discretionary power being granted the Legislature as to the “manner of publication.”
 

 We accordingly conclude that the statute (LSA-R.S. 39:503) is not violative of Article XIV, Section 14(a), of the Constitution.
 

 Plaintiffs next allege that because of certain irregularities in the conduct of the election the electors were deprived of a . fair, impartial and legal' opportunity to • express their will at the polls and that these irregularities deprived voters of votes in sufficient number and amount to have changed the results of the election. The alleged irregularities are as follows:
 

 a. The election commissioners and clerk were not sworn in as required by LSA-R.S. 39:506 before commencing their duties.
 

 b. No voting booth was provided and the voters had no opportunity to prepare their ballots in secrecy.
 

 c. The key to the ballot box was not kept by an election commissioner or clerk, but by the Chairman of the Board of Supervisors; it was not placed in public view.
 

 d. The ballots were not deposited in the box by the election commissioners, but by the individual voters, in contravention of LSA-R.S. 39:512.
 

 e. The counting and tabulation of the votes and handling of the ballots was partly done by others than the commissioners and clerk. There was confusion in such counting.
 

 f. One unsigned ballot in favor of both the propositions was signed after it was discovered that the voter, who was still present, had forgotten to sign it.
 

 g. During the counting of the ballots, the unused ballots remained on the table upon which the ballots being counted were lying.
 

 
 *865
 
 h. The Board of Supervisors refused to appoint a commissioner or deputy who was opposed to the election, and consequently petitioners had no one in a position of - any consequence to be able to observe the facts surrounding the election.
 

 i. When the Board of Supervisors canvassed the returns of the election, the ballots were again handled by persons other than the Board whose duty it was to examine and count the ballots as provided in LSA-R.S. 39:515.
 

 j. Unauthorized persons delivered the ballot box to the Clerk of Court.
 

 k. The ballot box was never properly sealed — only locked.
 

 Significantly, plaintiffs have alleged neither fraud nor corruption in the conduct of the election. Although they alleged that the irregularities enumerated above deprived the voters of votes sufficient in number or. amount to have changed the result of the election, the testimony in the lower court does not bear out their contention. Nor does the record contain any proof of any substantial nature showing any election irregularity which would have changed any vote cast or deprived any voter of his fair, impartial and legal opportunity to vote. The official recount ordered by and conducted under the supervision of the court reached the result that the election had carried both in number of votes cast and assessed valuation.
 

 It has frequently been observed by us that in the absence of fraud, corruption or proof that the irregularities complained of would have changed the result of the election, the election will not be set aside solely because of the failure of some ministerial officer to perform every formal direction prescribed by law. Duncan v. Vernon Parish School Board, 226 La. 379, 76 So.2d 403 (and cases cited therein).
 

 In the case of Bradford v. Grant Parish School Board, 154 La. 242, 97 So. 430, 431, in which the court disposed of a multitude of alleged irregularities ranging from the swearing in of commissioners to the canvassing of the returns, we said:
 

 “The election laws of the state must, of course, be observed with some degree of reasonableness; but it was never in contemplation that the carelessness or ignorance of election officials should afford the means of defeating the will of the people in the exercise of their highest prerogative.”
 

 The following cases, with some of the specific irregularities complained of, and in which the above-state principle was enunciated, are Burton v. Hicks, 27 La. Ann. 507 (commissioners failing to sign and'swear to returns, counting of votes not completed within time limit, commission
 
 *867
 
 ers not selected from different political parties, votes not placed in box in view of the voters, votes handed up by sticks, and taken by commissioners from the voters); Endom v. City of Monroe, 112 La. 779, 36 So. 681 (polling place not opened on time, majority of commissioners absenting themselves at different times, election ballots and poll lists left by election officials in unauthorized hands, voters influenced by hope of favor, others by threats, returns not timely filed); however the election was invalidated for failure to open the registration office as required by City Charter; Andrews v. Blackman, 131 La. 355, 59 So. 769 (failure of election officers to sign or forward a particular document in a particular manner, or provide a booth of particular dimensions, particularly situated, or constructed of particular material, but not preventing a free and honest expression of the will of the voters); Vidrine v. Eldred, 153 La. 779, 96 So. 566 (failure of a ministerial officer to perform duty imposed by law, or in the manner prescribed); McCann v. Mayor and Councilmen of Morgan City, 173 La. 1063, 139 So. 481 (irregularity in the list of registered voters used); Landry v. Ozenne, 194 La. 853, 195 So. 14 (delay in opening polls); Blanchard v. Iberville Parish School Board, 218 La. 784, 51 So.2d 70 (errors in list of voters furnished by registrar) ; Daigle v. Mayor and Board of Aldermen, 222 La. 556, 62 So.2d 833 (ballots were deposited in the ballot boxes themselves, no absentee voting provision made, ballot boxes not sealed immediately after counting of ballots, the commissioners were assisted by unauthorized persons); Duncan v. Vernon Parish School Board, 226 La. 379, 76 So.2d 403 (numerous omissions and errors in list of voters, commissioners not sworn as provided by law, polls remained open after legal hour for closing, voting booths were provided for voters and no opportunity for electors to prepare their ballots in secrecy).
 

 It will be observed that in many of the alleged irregularities complained of, the pronouncement and holding by our Court in the foregoing cases was adverse to these contentions.
 

 Furthermore, errors of judgment by commissioners of election is not good cause for vitiating the election when bad faith, fraud or corruption is not convincingly shown, sufficient in itself to change the results. Heine v. Jefferson Davis Parish Police Jury, 172 La. 889, 135 So. 667; Smith v. Parish Board of School Directors, 125 La. 987, 52 So. 122; McWilliams v. Board of Directors of Iberville Parish, 128 La. 422, 54 So. 928.
 

 As to alleged irregularities charging the Board of Supervisors with refusing to appoint a commissioner or deputy who was opposed to the election, that some of the commissioners left and others were
 
 *869
 
 appointed in their stead, and that no booths were provided for secret voting, we find that these complaints have also been adversely answered in Elkins v. Board of School Directors, 138 La. 207, 70 So. 99. Also see Patterson v. City of DeRidder, 235 La. 140, 103 So.2d 68; and Dowling v. Orleans Parish Democratic Committee, 235 La. 62, 102 So.2d 755.
 

 The remaining contention of plaintiffs is that the election must be held invalid because the amount of the tax bonds approved by a majority of the voters exceeds the debt limitation established by Article XIV, Section 14(f), of the Constitution. It is argued that in the event we should sustain the legality of the election defendant should be enjoined not only from issuing bonds exceeding the constitutional limitation, but also from entering into a contract or contracts for the construction of sewers and sewerage disposal works exceeding ten per cent of the district’s assessed property valuation.
 

 Defendant vigorously denies that the bond .issue voted upon exceeds the constitutional debt limitation, but contends that, assuming that the amount of the bonds is in excess of the debt limitation, this fact would merely restrict the governing authority only to the extent of the excess over the debt limitation, and not per se invalidate the election.
 

 Article XIV, Section 14(f), of the Constitution provides in part:
 

 “No debt shall be incurred and bonds issued therefor by any subdivision hereunder for any one of the purposes herein provided, which * * * shall exceed in the aggregate ten per centum of the assessed valuation of the taxable property of such subdivision, to be ascertained by the last assessment for parish, municipal or local purposes previous to incurring such indebtedness; * * *
 

 The contention that the election should be invalidated because the amount of the bonds voted by the taxpayers of the district is above the debt limitation is without merit. The above-quoted provisions are to the effect that the total amount of all bonds to be issued shall never exceed in the aggregate ten per centum of the assessed valuation to be ascertained or based on the last assessment previous to incurring such indebtedness. Conceding that the aggregate of the bonds issued or to be issued are in excess of the constitutional ceiling, the authorization voted by the electors of the district is not null and void in its entirety, nor can we hold that the election in its entirety is invalid from the mere fact that it attempted to convey a power to the sewerage district greater than the taxpayers were competent to grant. Rather, the authorization granted must be held legal up to and within the limitation furnishing the means of paying the principal and interest of the debt to be contracted. Oubre v.
 
 *871
 
 Town of Donaldsonville, 33 La.Ann. 386; Gray v. Tax Collector, 107 La. 671, 32 So. 42; Board of Com’rs v. Wilkins Co., 125 La. 127, 51 So. 91; Kansas City Southern Ry. Co. v. Hendricks, 150 La. 134, 90 So. 545. Hence, it would follow that the excess above the debt limitation of ten per cent would be held to be null and void, and the Board of Commissioners in the instant case would necessarily be restricted to the sale of bonds up to and within the debt limitation of ten per cent based on the last assessment of property situated within the sewerage district.
 

 However, we find in the record the positive testimony of Hon. A. G. Hammett, Assessor of Caddo Parish, wherein he specifically declared, and as shown by a certificate signed by him in his official capacity dated April 29, 1959, four days after the election, that the assessed valuation of property within the district, and according to the latest assessment roll of record on the election day, was $901,010; that deducting the amount of $32,470 representing tax exempt properties would leave a total assessed valuation of $863,540; and that, considering all possible contingencies, he entertained no doubt that the assessed valuation of the district on the assessment rolls of 1958 was “well in excess of $850,-000.00.”
 

 The bond issue voted in this instance aggregates $85,000. Hence, we find no justification to deny the granting of authority for issuing bonds to this amount, it being well within the ten per cent constitutional limitation, supra.
 

 For these reasons it is ordered, adjudged and decreed that the judgment appealed from be reversed, annulled and set aside and that plaintiffs’ suit be and it is hereby dismissed at their cost.
 

 HAMITER, J., recused.
 

 [1]
 

 . “No law shall be revived or amended by reference to its title but in such cases the act revived, or section as amended, shall be re-enacted and published at length.”
 

 [2]
 

 . Sub-Part A, Part 1, Chapter 9, Title 33 (LSA-R.S. 33:3881-33:3889).
 

 [3]
 

 . LSA-R.S. 39:471 provides: “Governing authorities. The governing authority of subdivisions are: (1) For parishes, road and subroad districts, and
 
 sewerage districts
 
 composed of territory outside of the corporate limits of municipal corporation, * * * the police jury of the parish or the equivalent; * * (Italics ours.)