McBRIDE, Judge.
Plaintiff contractor recovered judgment for the final payment ($37,161.52) on a contract for the construction of a sewerage treatment plant and appurtenances at Nor-co, St. Charles Parish, Louisiana, but its claim for damages ($38,402.84) allegedly occasioned by defendant’s delay of the work and the claim for extra work ($745.-95) were denied. Plaintiff appeals.
Defendant (sometimes hereinafter called the “Board”) advertised for bids during *185 January, 1959, which were opened March 4, 1959, plaintiff’s being accepted as the lowest. The formal contract was signed April 30, 1959; it consists of 10 pages of Contract Documents (CD), 18 pages of General Conditions (GC) and 59 pages of Detailed Specifications (DS) ; the cost of the job was stipulated to be $368,535; on the same day, plaintiff furnished its contractor’s performance bond.
Under Section 13.00(GC), the Board was required to issue within 10 days an order to the contractor to proceed with the work, after which the contractor had 10 days to commence the job. Section 2.01 (DS) provides : “The General Conditions are a part -of the Specifications and shall apply to all work done unless these Detailed Specifications specifically take exception to certain items of the General Conditions.”
The Board contemplated the marketing of $725,000 of Sewerage Revenue Bonds and $575,000 of Tax Bonds, the aggregate of which issues 'was the requirement to finance the instant contract and another the Board had entered into.
With reference to finances, Section 2.04 (DS) provides:
“Financing of Project: The attention of all Bidders is called to the fact that after bids are received, Sewerage District No. 1 of the Parish of St. Charles will offer revenue and ad valorem tax bonds for sale to finance the cost of the work; that the award of the contract for the construction of a Sewage Treatment Plant and Appurtenances will he made promptly, hut the contract will he subject to the sale and delivery of said bonds; and that obligations of Sewerage District No. 1 of the Parish of St. Charles under the contract thus awarded will be payable solely from proceeds derived from issuance and sale of said bonds.” (Italics ours.)
Thus, the provisions of Section 2.04(DS) “specifically take exception” to Section 13.00 (GC) which pertains to the time the work order was to issue. This meant that although the contract was to be entered into, any execution of the work was to be suspended and held in abeyance until the bonds could be marketed; otherwise, the Board would be unable to meet the progressive payments under its contracts had it issued work orders prior to the disposal of the bonds. Plaintiff contractor knew and thoroughly understood that the execution of the contract was dependent upon financing as contemplated by Section 2.04(DS) for we find in a letter written by its president to the Board on November 24, 1959, it is stated:
“ * * * we understand that the Board cannot legally issue an unqualified Work Order until the Bonds are actually delivered.” (Italics ours.)
The bond market prevailing between March, 1959, and early 1962 was very poor. To demonstrate the softness of the market, the Board’s attorney who prepared the bond transcript testified that the State Bond and Tax Board (see LSA-R.S. 47:1803) authorized a 5% maximum rate of interest on the bonds; however, prior to their actual delivery to the purchaser in July, 1960, further authorization was obtained from said Board to increase the interest on the revenue bonds to 5j)4%, this to satisfy the bond purchaser.
Certain other matters and events which were beyond the Board’s control came to pass and delayed and hindered the floating of the bonds. Not until July 20, 1960, was the Board able to deliver the bonds to the purchaser. On the same day, the work order called for in Section 13.00(GC) was thereupon issued to the contractor, which commenced the work the following day. The job was accepted by defendant on or about December 15, 1961.
All parties concerned were extremely desirous that the job be proceeded with; particularly was the contractor aggrieved by the delay in the issuance of the work order. *186 In many letters it complained to the Board, in several of which the Board was notified that the contractor had suffered and would continue to suffer material damages as the result of the non-issuance of the order.
But, the Board was having its troubles. The majority of the bonds are denominated Sewerage Revenue Bonds, which stipulate that their retirement would be from the collection of charges levied for use of the sewer system. It was well-known that if a user neglected to pay the monthly sewer charge, the Board would be at a distinct disadvantage with regard to collection as it had no remedy to effectively enforce payment. It could not “cut off” the service as other utilities might do. The bond buyers were insisting that the sewer charges be collected for defendant’s account by Water Works District No. 1 of the Parish of St. Charles, and it was not until August 20, 1959, that an agreement could be entered into between defendant and the Water Works District whereby the latter would collect sewer charges along with its water bills, thus establishing an effective means of enforcing collection. The Board’s engineer incorporated the agreement between the two utilities in his Engineering Report and Supplement; he testified he collaborated with the bond buyers in completing the report regarding the retirement schedule of the bonds. The first engineer’s report, August 9, 1958, had to be completely re-worked in order to render the bonds marketable.
On July 10, 1959, another event transpired which militated against immediate disposition of the bonds. The case of Johnson v. Sewerage District No. 2 of the Parish of Caddo was filed in the First Judicial District Court, Parish of Caddo; plaintiffs therein sought to have declared null, void and of no effect a special bond and tax election held by Sewerage District No. 2 of the Parish of Caddo, on the ground, inter alia, that the Board of Supervisors of said sewerage district had no right, power or authority to order and hold said election, since the Police Jury of the Parish of Caddo was the governing authority of said sewer-: age district. All parties interested in the bonds comprehended at once the implications of said litigation. The election which authorized the bonds defendant was seeking to sell had been called and held by defendant’s Board, and a decision in the Johnson case favorable to the plaintiffs therein would have nullified the results of said election and anything done pursuant thereto-. On November 18, 1959, the trial court in the Johnson case held that the special bond and tax election ordered by the Board of Supervisors of Sewerage District No. 2, Parish of Caddo, was illegal and without effect. This, of course, only served to compound everyone’s dismay regarding disposal of the bonds issued by defendant.
Defendant’s Board of Supervisors held a meeting at Norco December 7, 1959; besides the three members of the Board in attendance were the president of plaintiff corporation, a representative of the other contractor, defendant’s engineer, defendant’s attorney and the attorneys representing the proposed bond buyers. It was the expressed hope of all present that the Cad-do Parish litigation would terminate speedily and favorably; those present were told that an appeal had been perfected in the case and an early decision might be expected from the Supreme Court. It is appropriate to mention that the attorney for defendant’s Board and the attorneys for the bond buyers filed briefs as amici curiae in the Supreme Court.
What was decided at the December 7 meeting with reference to the construction contracts is the subject of dispute which we deem unnecessary to resolve. The day after the meeting, plaintiff’s president addressed to defendant’s engineer a memorandum of his recollection of the nature of the agreement reached at the meeting. This memorandum closes with the following paragraph:
“It was then decided and agreed upon between the Board and the Contractors, that the Contracts would be held in *187 abeyance until the final outcome of the Supreme Court decision was known. At that time, the Contractors would, if they saw fit, request an equitable adjustment to their Contract based upon the circumstances prevailing at that time. The Board would then have the option of accepting the adjustment or re-advertising the projects.”
The engineer forwarded copies of the memorandum to the members of the Board and to defendant’s attorney with the request that they answer plaintiff directly as to whether the memorandum correctly covered the situation. December 28, 1959, defendant’s chairman answered by sending a letter to plaintiff “enclosing a copy of our minutes for your records.” The copy is signed by the chairman and secretary of the Board. However, defendant has adopted the position that the copy was only the proposed minutes which had not been officially adopted. But be that as it may, the said minutes contain language to the effect that the contractors: “stated that they were willing to continue their contracts in effect until funds became available to begin construction” and “The Board of Supervisors stated that this type of co-operation was, indeed, appreciated and that any cost increases which might operate to bring about losses to the contractors would be favorably considered with them prior to the commencement of construction.”
Subsequently, defendant’s Board sent plaintiff a copy of the “official” minutes of the December 7 meeting, the pertinent part of which recites:
“ * * * The contractors and the Board indicated that the interested parties, at this point, would meet for further discussion.”
On January 18, 1960, plaintiff’s president addressed a letter to the Board stating:
“ * * * my agreement with the Board at this meeting is not accurately stated in those Minutes. The agreement * * was that we would hold our Contract in abeyance till the outcome of the Supreme Court decision was known. At that time, if you were then in a position to go ahead with the work, we would seek an equitable adjustment to our Contract, and that failing this, you would then re-advertise the work.”
On April 25, 1960, the Supreme Court reversed the lower court in the Johnson case and dismissed plaintiff’s suit (239 La. 840, 120 So.2d 262). Upon the finality of the decree the way was cleared for the sale and delivery of defendant’s bonds, which took place July 20, 1960. The order to proceed was issued during the course of a meeting, held in New Orleans on the same day, at which officials of defendant, the Board’s counsel, its engineer, and Mr. James Graham, plaintiff’s vice president, among others, were present. The Board’s engineer handed the work order to Mr. Graham, who signified his acceptance thereof. Mr. Graham was handed a letter from defendant’s Board dated July 20, in which the Board notified plaintiff that all claims it had asserted for damages for the delay in the issuance of the work order were rejected. Some dispute exists as to whether the letter was given to Mr. Graham simultaneously with the work order or subsequently, but that is of no moment. Plaintiff commenced work under its contract the very next day without further ado.
On August 5, 1960, defendant received a communication from plaintiff’s president in which plaintiff reiterated its request for the payment of damages and urged the Board to reconsider its decision.
The delay in selling and delivering the bonds may be attributed to conditions and events which no party at interest could foresee or control. The efforts of the Board were bona fide. No neglect, dereliction or inexcusable delay on the part of the Board has been shown; hence, it is not liable for the damages plaintiff is claiming. Plaintiff entered into the contract with full knowledge and with the understanding that its undertaking depended and was conditioned *188 «pon the Board being' able to float the bonds, and, therefore, in signing the contract, plaintiff assumed a calculated risk that the bonds might not be immediately disposed of. The several cases from this and other jurisdictions cited by plaintiff to the point that the owner is liable to the contractor for damages for any unreasonable delay of the work are inapposite for the reason that in each one of the cases the owner was the author of the delay. Although plaintiff maintained that the “proposed minutes” of the December 7 meeting prepared by the Board’s attorneys do not truly reflect the agreement of the parties, yet plaintiff’s counsel now stand upon the verity of such minutes and contend that they show defendant admitted liability for plaintiff’s damages. Counsel point out the recital that “any cost increases which might operate to bring about losses to the contractors would be favorably considered” prior to the commencement of construction. We do not construe the language to be an admission of liability. All that was meant by the language of the proposed minutes and by that of the other three versions of the December 7 meeting was that before work was begun, the parties would discuss the matter of damages and make proper adjustment if such was warranted. None of the four versions of the meeting indicates that defendant’s Board ever unqualifiedly and unequivocally admitted liability on its part for all or any part of the damage which plaintiff sought to collect. By the time the work order was issued, the Board had come to the conclusion that it was not liable and, hence, so notified plaintiff in the letter handed to Mr. Graham.
The claim for extra work ($745.95) was also rejected below. The question is whether the subject work, i. e. the shaping and surfacing of Marino Drive, Eighth and Barreca Streets, was included in that to be done under the contract, which provides that a 14-inch pipeline was to be installed under said streets, on the shoulder of the road and partly in the paralleling ditch. Plaintiff’s Mr. Graham testified that the trench was excavated, the pipeline installed and then the trench was backfilled, finished and drained off. Plaintiff insists that this was all that was required under the terms of the contract. The work for which the extra claim is made was done by plaintiff under protest when defendant’s engineer threatened to shut down the work unless the same was performed.
On the other hand, defendant’s resident engineer (Pilie) testified that vehicles could not pass and that the Police Jury insisted that the contractor refill the streets. Pilie pointed to Section 1.07 (DS) to support his contention that the work was contemplated by the contract. That section provides that tlie contractor shall, at all times, maintain all backfilled trenches in roadways, streets, driveways and walkways in such manner as to minimize inconvenience to the public. Pilie stated that the Police Jury was the authority which had to make final acceptance of the streets. Section 14.02 (DS) provides that all work shall be executed in strict accordance with all parish and local laws. Our conclusion is that the work for which the extra claim is made was part of that called for under the contract
Interest from the date the job was completed is not due on the final payment. Section 56.00 (GC) provides that the contractor and owner shall execute a release of the contract when final payment is made, which shall be recorded according to law. Plaintiff, believing it had other claims against defendant, refused to execute the release, and, consequently, defendant refused to pay. Plaintiff’s other claims as above stated were not valid, and in refusing to comply with the contract respecting the signing of the release, plaintiff took the second calculated risk. Where the contractor refuses to release the contract upon final payment according to the provisions contained in the contract, he cannot complain about the owner’s withholding the payment.
 The trial judge erred in dividing the costs between the parties; defendant should have been cast for the whole amount.
*189 It was the party cast. LSA-C.C.P. arts. 1920, 2164. Defendant’s immunity from liability was waived for all purposes by the Constitution, and it is liable for the payment of costs in an action by a contractor arising out of contract. LSA-Const. 1921, art. 3, § 35, as amended; Pittman Construction Company v. Housing Authority of New Orleans, La.App., 169 So.2d 122 (cert, denied).
For the reasons assigned, that part of the judgment which provides that costs are to be borne equally by each party is reversed, and the judgment is amended so as to provide that defendant is to pay the costs of the lower court, and as thus amended and in all other respects the judgment is affirmed. Costs of appeal are to be borne by appellant.
Reversed in part, amended and affirmed.