Dear Mayor Yenni:
You have asked the opinion of this office concerning a myriad of issues arising from a compensation and benefits package, referred to as the "Executive Pay Plan" ("EPP"), provided to certain qualified executive employees of the City of Kenner ("City"). The original opinion request was supplemented by Councilman Joseph A. Stagni with four additional questions concerning the EPP. Each of the original and supplemental questions involves three core issues: whether the EPP is legally authorized by the City, whether current and former participants in the EPP have a vested property interest in the benefits of the plan, and whether the benefits of the EPP should be continued for current and former participants.
 The Executive Pay Plan
Former Mayor Aaron Broussard purportedly formalized the EPP for qualified executives by signing a December 2, 1991 memorandum ("1991 Memorandum") authored by the Personnel Director for the City.[1]
Between 1991 and 2006 the EPP was expanded several times to add more benefits and more executives qualified to participate the EPP. Most of these changes are evidenced by the Mayor's signature or initials on memoranda authored by appointed employees of the City.[2] *Page 2 
On January 20, 2010, Mayor Muniz rescinded the EPP for all qualified executives hired from that date forward. At the time Mayor Muniz canceled the EPP for prospective hires, the additional benefits granted to participants in the plan included the following:
1. Life Insurance
The City provided paid Life Insurance and Accidental Death and Dismemberment policies with benefit of $30,000 each, which was double the benefit for non-participants.
2. Retirement Benefits
The City paid the full employee contribution share to the Municipal Employees Retirement System of Louisiana ("Retirement System"[3]
for participants, which contribution equals 9.25% of the employee's salary.
3. Administrative Leave
Each participant accrued 3.5 hours of paid administrative leave per month in lieu of compensatory time, except for Directors who accrued 7 hours per month.
4. Severance Pay
Upon separation from employment, participants with a minimum of ten continuous years in the EPP received severance pay in the form of payment for accrued unused sick leave, up to a maximum of 90 days.
5. Health Insurance
Upon separation from employment, participants having a minimum of ten continuous years in the EPP would be eligible to receive employee-only health insurance, with 100% of the premium payments made by the City. *Page 3 
Neither the original 1991 Memorandum, nor any of the subsequent memoranda adding benefits to the EPP, indicate which employees were "qualified executives" eligible to participate in the EPP. On January 19, 2005, the Personnel Director for the City authored an unsigned memorandum to former Mayor Phil Capitano ("2005 Memorandum") summarizing the then-current benefits of the EPP. The 2005 Memorandum also set forth, for the first time, a list of qualified executives that enjoyed the benefits of the EPP. The list included the Mayor, Chief of Staff, Chief Administrative Officer, Deputy Chief Administrative Officer, In House Counsel, and Directors[4]. On July 1, 2006, Mayor Muniz issued a memorandum that added "all Assistant Directors and Executive Assistants" to the list of qualified executives participating in the EPP. By the time Mayor Muniz canceled the EPP for prospective hires, the ranks of qualified executives had swelled to include the following offices:
1. Mayor
2. Chief of Police
3. Council Members
4. Chief Administrative Officer
5. Deputy Chief Administrative Officer
6. City Attorney
7. Deputy City Attorney
8. Senior Assistant Attorney
9. Assistant City Attorney I
10. Deputy C.A.O. of Public Works
11. Directors
12. Assistant Directors
13. Executive Assistant to the Mayor
14. Police Liaison Officer
15. Assistant to the Mayor/Public Information Officer
16. Assistant to the Mayor/Internal Auditor
17. Clerk of the Council
18. Clerk of the Council Administrator
19. Fire Chief *Page 4 
While the members of the Council of the City of Kenner are listed as qualified executives, apparently they participated in a different plan known as the Executive Pay Plan for Elected Officials ("EPP for Elected Officials"). The evidence of the existence of the EPP for Elected Officials is an unsigned memorandum dated January 20, 2005 from the Personnel Director to former Mayor Capitano. According to that memorandum, the benefits of the EPP for Elected Officials included:
1. Life Insurance
The City provided paid Life Insurance and Accidental Death and Dismemberment policies with benefit of $30,000 each, which was double the benefit for nonqualified employees.
2. Health Insurance
Upon their separation from employment, qualified elected officials having a minimum of ten continuous years would be eligible to receive employee-only health insurance, with 100% of the premium payments made by the City.
Except where the context dictates otherwise, all reference to the EPP herein shall include both the EPP and the EPP for Elected Officials.
 The City Charter
In order to consider the validity of the EPP, we first look to the City's charter. The City is governed by a Home Rule Charter, and has adopted a mayor-council form of government. Home Rule Charter of the City of Kenner ("Charter"), § 1.02. The elected Council forms the legislative branch of government; the elected Mayor is the Chief Executive Officer of the government. Id. As Chief Executive Officer, the Mayor is vested with all executive and administrative authority:
The Mayor shall be the Chief Executive Officer of the City. All executive and administrative authority of the City shall be vested in the Mayor and exercised by him, in the manner and subject to the limitations as hereafter set forth in this Charter.
Charter, § 3.01.[5] The Charter grants the Mayor "the power to appoint and remove all *Page 5 
non-elected City officials and employees, subject to the provisions of applicable state law and this Charter." Charter, § 3.10; see also
Charter, § 4.07 ("The Mayor is charged with the responsibility of employing and terminating all personnel of the City except as otherwise provided by applicable law and this Charter.")
The Charter does not, however, grant the Mayor unilateral authority to fix the compensation of employees that he hires. According to the Charter, the Mayor submits a pay plan for City employees to the Council for its approval:
[The Mayor] shall prepare and submit to the Council the pay plan, the operating and capital budgets, and all other planning and programming documents as require Council approval.
Charter, § 3.09 (effective until December 31, 2006).[6] Thus, pursuant to the provisions of the Charter addressing the powers of the Mayor, the Council holds the final authority to approve the compensation of City employees.
Furthermore, the provisions of the Charter that address the authority of the Council include a Section that specifically requires an ordinance to change the compensation of elected officials and employees with supervisory responsibilities. Section 2.13 sets forth a list of matters that require a special ordinance procedure involving extended periods of holdover and publication:
Section 2.13. Proposed ordinances on any of the following specified subjects shall be introduced and adopted only at regular meetings of the Council and shall not be adopted until at least twenty-eight (28) days after being introduced, nor until the proposed ordinance shall have been published by caption in the official journal at least twice, to wit:
 * * *
(F) Decreasing or increasing salaries or other compensation of any elected official or appointed City employee in a supervisory capacity provided for in this charter. *Page 6 
Charter, § 2.13(F). Therefore, any increase in salaries or other compensation, which would include extra benefits, for elected officials and employees with supervisory responsibilities can only be accomplished by a special ordinance adopted by the Council pursuant to the extended publication and delay provisions of Section 2.13 of the Charter.Id.[7]
 The Legality of the EPP
Courts have long recognized the fundamental constitutional principle that a municipality that has adopted a home rule charter is bound by its own charter:
Pursuant to Article VI of the Louisiana Constitution, a municipal authority governed by a home rule charter possesses powers, in affairs of local concern within its jurisdiction, that are as broad as those of the state, except when limited by the constitution, laws permitted by the constitution or its own home rule charter.
Fransen v. City of New Orleans, 2008-0076 (La. 7/1/08), 988 So.2d 225, 234. It follows that any action by a City that is not authorized by its home rule charter is invalid ab initio. See, e.g., La.Atty.Gen.Op. Nos. 93-749, 86-51.
In this case, the Charter specifically states that any increase in compensation, including extra benefits, for elected officials and employees with supervisory responsibilities can only be accomplished by a special ordinance adopted by the Council pursuant to the extended publication and delay provisions of Section 2.13. Charter, § 2.13(F). The original opinion request letter from Mayor Muniz confirmed that "all of the executive employees included [in the EPP] have significant responsibilities and supervisory authority." It follows that any increase in benefits for employees qualified to participate in the EPP could only have been accomplished by a special ordinance adopted by the Council pursuant to Section 2.13(F) of the Charter.
We have not been presented with any evidence that the Council adopted an ordinance explicitly authorizing the additional benefits extended to employees who participated in the EPP. The office of the Mayor has confirmed that it has no knowledge that the EPP *Page 7 
was ever submitted to the Council, and has no knowledge of any ordinance or resolution approving or amending the Executive Pay Plan. Accordingly, this office is of the opinion that neither the Executive Pay Plan, nor the Executive Pay Plan for Elected Officials, was legally authorized by the City.
We have considered the question of whether the Council's annual adoption of a budget ordinance could have constituted tacit approval of the EPP, since the budget ordinance necessarily included funding for the EPP. According to this line of reasoning, the approval of a budget ordinance would obviate the requirement for a special ordinance to change compensation for elected officials or appointed officials with supervisory responsibilities set forth in Section 2.13(F). Since a budget ordinance is adopted each year, Section 2.13(F) would be rendered meaningless.
Statutory construction must aim to attribute reasonable meaning to an entire statutory framework and context. McGee v. Police Jury of CaddoParish, 63 So.2d 153 (La.App. 2 Cir.1953). Therefore, individual statutory provisions are to be given effect wherever possible. Fakier v.Picou, 166 So.2d 257 (La.1964); Johnson v. Sewerage District No. 2 ofParish of Caddo, 120 So.2d 262 (La.1960). Any interpretation should preserve the meaning and effectiveness of each statutory provision.Johnson v. Collector of Revenue, 165 So.2d 466 (La.1964); Fruge v.Muffoletto, 137 So.2d 336 (La.1962). Under these principles of statutory construction, we cannot interpret the Charter in a manner that would effectively eliminate Section 2.13(F). As such, the passage of an annual budget ordinance cannot qualify as the Council's approval of the EPP or the EPP for Elected Officials.
Furthermore, one of the reasons for the requirement of a special ordinance for increasing the compensation of supervisory employees is to ensure that the process is transparent to the public. Our review of select past budget ordinances submitted by the City reveals no evidence of the EPP, and no specific approval of funding for special benefits that are provided to some employees but not all employees. For example, the retirement contributions for all employees of each department, including qualified and non-qualified employees, are shown as one lump sum for the entire department. There is one line item that shows a "+ 9.25%" on the line, but it is not apparent that this amount is only paid for certain employees. Likewise, none of the budget documents that have been provided to this office reflects the other benefits for EPP participants, such as higher life insurance benefits, administrative leave, severance pay, or post-employment health insurance benefits. While this office does not make findings of fact, there is considerable doubt that the adoption of the budget ordinances would have been a de facto adoption of the EPP, or that the public could have been on notice of the existence of the EPP. Accordingly, it is the further opinion of this office that the annual *Page 8 
budget ordinances adopted by the Council, which may have included funding for the EPP benefits, does not, in and of itself, waive the requirement of an ordinance or constitute a ratification or confirmation of the EPP benefits.
 Due Process Considerations
The original opinion request letter asks whether current and former participants in the EPP may have a vested property interest in the additional benefits of the plan, and whether notice must be given to said participants before terminating the additional benefits. Both the federal and state constitutions guarantee that no person shall be deprived of property without due process of law. U.S. Const., Amend. XIV; La. Const. art. I, § 2. An essential principle of due process is that a deprivation of life, liberty, or property "be preceded by notice and an opportunity for hearing appropriate to the nature of the case." Cleveland Bd. OfEducation v. Loudermill, 470 U.S. 532 (1985), citing Mullane v. CentralHanover Bank Trust Co., 339 U.S. 306 (1950).
In order to assert the protections of due process, however, one must show the existence of some property or liberty interest that has been adversely affected by state action. Delta Bank Trust Co. v. Lassiter, 383 So.2d 330, 334 (La.1980); Taylor v. Haik-Terrell, 97-2119 (La.App. 1 Cir. 11/6/98), 722 So.2d 317, 322, writ denied, 98-2995 (La.12/9/98), 729 So.2d 583. Property interests are not created by the constitution. They are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law, that secure certain benefits, and that support claims of entitlement to those benefits. Board of Regents of State Colleges v. Roth, 408 U.S. 564, 577 (1972); Acadian Ambulance Service, Inc. v. Parish of East BatonRouge, 97-2119 (La.App. 1 Cir. 11/6/98), 722 So.2d 317, writ denied, 98-2995 (La.12/9/98), 729 So.2d 583.
It is generally recognized that when an employer promises a benefit to employees, and employees accept by their actions in meeting the conditions for such benefit, the result is not a mere gratuity or illusory promise but a vested right in the employees to the promised benefit. Knecht v. Board of Trustees for State Colleges Universities Northwestern State University, 591 So.2d 690, 695 (La. 1991). In all cases, however, an obligation cannot exist without a lawful cause. La.Civ.C. art. 1966; Lafleur v. City of New Orleans, 2001-3224 (La. 12/4/02), 831 So.2d 941, 946. The cause of an obligation is unlawful when the enforcement of the obligation would produce a result prohibited by law or against public policy. La.Civ.C. art. 1968; Lafleur, 831 So.2d at 946. *Page 9 
In applying these principles we are guided by the Louisiana Supreme Court opinion in Lafleur v. City of New Orleans, 2001-3224 (La. 12/4/02), 831 So.2d 941. In Lafleur a class of current and former police officers claimed to have a vested property interest in the payment of a full-day salary for each day of unused accrued sick leave, referred to as "one-to-one" compensation for unused accrued sick leave. Id. The plaintiffs relied on a widely-followed and well-known departmental practice of allowing police officers to "run out" accumulated sick leave immediately prior to retirement. Id. at 619. According to this practice, "a police officer who was ready to retire took the balance of his sick leave without reporting to work and received his regular paycheck until his accumulated sick leave was exhausted. Id.
By law, however, the only authorized means to use accumulated sick leave were (1) to use the leave for an actual injury, illness, quarantine, or death in the family, (2) to convert the unused accrued sick leave to retirement credit upon separation from city employment, and (3) to receive a lump-sum cash payment for unused, accrued sick leave upon separation from city employment. Id. at 946. The court found that the members of the plaintiff class did not have a vested interest in one-to-one payment for unused accrued sick leave because that benefit was not lawfully authorized:
Although the record clearly establishes the existence of a departmental practice that might have constituted a benefit that vested in the form of deferred compensation had the policy been authorized by law, the fact that the policy violated express provisions of city civil service rules prevents the establishment of a vested right in favor of the plaintiffs.
Id. at 947. The court found that the plaintiffs did not have a vested interest in the one-to-one payment for unused accrued sick leave.
In applying the precedent established by Lafleur, the following statement from that opinion is ultimately dispositive of any claim that current and former City employees may have to a vested interest in the benefits of the EPP:
[A] valid contract cannot be formed as a result of a legally unauthorized employer policy and consequently, an invalid contract cannot create a vested property right.
Id. at 946. Accordingly, the City could not form a valid contract with qualified executives to provide the additional benefits of the EPP, since those plans were never legally authorized. It necessarily follows that the purported contract for unauthorized additional benefits under the EPP cannot and did not create a vested property interest in those *Page 10 
benefits. Absent a vested property interest in the unauthorized additional benefits of the EPP, neither current nor former participants in the EPP can assert the protections of due process. Delta Bank TrustCo., 383 So.2d at 334; Taylor, 722 So.2d at 322. This office is therefore of the opinion that neither current nor former participants in the EPP have any vested interest in the additional benefits included in the EPP, and that no notice is required before the benefits are withdrawn.
 Questions Posed in the Opinion Request Letters
In accordance with the foregoing conclusions, we now address the ten individual questions set fort in the original opinion request:
1. Is it permissible for the City of Kenner to provide additional benefits [to] employees in the Executive Pay Plan?
Because the City never legally authorized the EPP, it is not permissible to provide any additional benefits to employees participating in the EPP.
2. Is it permissible for the City of Kenner to provide additional benefits to retirees that were in the Executive Pay Plan?
Because the City never legally authorized the EPP, it is not permissible to provide any additional benefits to retirees who participated in the EPP.
3. Is it permissible for the City of Kenner to provide benefits to those persons who were in the Executive Pay Plan but are no longer employed by the City and who are not eligible to retire?
Because the City never legally authorized the EPP, it is not permissible to provide any additional benefits to those persons who participated in the EPP and are no longer employed by the City, but who are not eligible to retire.
4. If the answer is no to any or all questions above, do any of the current employees or past employees have a vested property interest in the benefit such that it has become a property right?
In accordance with the Lafleur decision and the foregoing discussion, the purported contract for unauthorized additional benefits under the EPP did not create a vested property interest in those benefits. *Page 11 
5. Did the fact that these benefits were authorized by the Mayor, in a Home Rule Charter city, in a written Executive Pay Plan rise to the level of a property right so that current employees and previous employees can maintain their health insurance coverage when they terminate their employment after ten (10) years?
In accordance with the Lafleur decision and the foregoing discussion, the purported contract for unauthorized post-employment heath insurance benefits for employees who participated in the EPP did not create a vested property interest in those benefits. Neither current nor previous employees can maintain any additional post-employment health insurance benefits pursuant to the EPP.
6. Is there a difference between current employees and previous employees?
A person's status as a current employee or a previous employee does not affect that person's right to assert the protections of due process. Rather, the appropriate inquiry is whether such individual has a vested interest in the rights at issue, which must be answered in the negative under the facts presented. See Roth, supra, Lafleur, supra.
7. If so, must the City of Kenner terminate the benefit for those persons who are still employed and have not received the post-employment health insurance benefit?
Because the City never legally authorized the EPP, it is not permissible to provide any additional benefits to employees participating in the EPP.
8. Must the City of Kenner take this benefit away from those previous employees that have relied on this insurance plan since they terminated their employment with the City?
Because the City never legally authorized the EPP, it is not permissible to provide any additional benefits, including the health insurance benefit, to retirees who participated in the EPP. As discussed above, the reliance on the benefit cannot create an obligation on the part of the City to provide an unlawful benefit.
9. If the City of Kenner is obligated to terminate the payment of health insurance premiums for former employees and officials that were not eligible to retire when they terminated their employment or term, how much notice will be required?
Because former employees and officials who participated in the EPP have no vested interest in the benefits at issue, they cannot assert the protections of due process in the form of advance notice. *Page 12 
10. What type of notice must be given to current employees if this benefit must be terminated?
Because current employees who participate in the EPP have no vested interest in the benefits at issue, they cannot assert the protections of due process in the form of advance notice.
Turning now to the four additional questions posed by Councilman Stagni, we respond as follows:
11. Is the Executive Pay Plan legal?
As stated above, this office is of the opinion that the Executive Pay Plan, and the Executive Pay Plan for Elected Officials, were never legally authorized by the City.
12. Does establishing an "Executive Pay Plan" or other similar plan require a transparent process such as an ordinance to be passed by the governing body, public disclosure, or any sort of advertising?
Any increase in the compensation or benefits for elected officials and employees with supervisory responsibilities can only be accomplished through a special ordinance adopted by the Council pursuant to the extended publication and delay provisions set forth in Section 2.13 of the Charter. Charter, § 2.13(F).
13. On July 1, 2006 numerous employees were added to the EPP doubling the cost of pension payments by taxpayers. Is it permissible for the Mayor, from this day forward, to discontinue the practice of Kenner paying the 9.25% employee contribution for Executive Pay Plan Members?
In 1995, the legislature granted the City statutory authority to pay the employee portion of contributions to the applicable retirement system. La. R.S. 11:1867. Nevertheless, because the City never legally authorized the EPP, there exists no current authority for the City to exercise that authority for participants in the EPP. As such, the Mayor is obligated to cease paying the employee contribution to the retirement program for qualified executives pursuant to the EPP.
14. Is it permissible for the Mayor to stop Life and Health Insurance benefits for those not currently employed by the city but who have been considered EPP members? *Page 13 
Because the City never legally authorized the EPP, it is not permissible to provide any life or health insurance benefits to those persons who participated in the EPP and are no longer employed by the City, but who are not eligible to retire.
 Additional Considerations
It is important to note that the foregoing answers are solely directed to the additional benefits afforded to participants in the EPP. The affected participants, current and former employees included, are entitled to the contemporaneous benefits that would have been afforded to those participants if they had not been qualified to participate in the EPP. Recall also that the answers are directed not only to participants in the EPP, but also to participants in the EPP for Elected Officials.[8]
Finally, we do not express any opinion on the potential ethical violations involved in the unauthorized implementation of the EPP by the very officials who participated in the plan, as the Louisiana State Board of Ethics renders advisory rulings regarding the Code of Governmental Ethics, La. R.S. 42:1111, et seq. Likewise, we decline to express an opinion on the potential violation of state and federal criminal laws, because that is not the function of an Attorney General's opinion. See,e.g., La.Atty.Gen.Op. Nos. 08-0012, 84-245. Furthermore, we note that the original jurisdiction to institute criminal prosecutions rests with local and federal law enforcement authorities, and it would be inappropriate to interfere with such jurisdiction by rendering an opinion on violations of criminal laws.
We trust that this opinion adequately responds to your request, and thank you for the opportunity to be of service. If you have any questions or comments, please contact our office. *Page 14 
Sincerely yours,
 JAMES D. "BUDDY" CALDWELL
 ATTORNEY GENERAL
 BY: __________________________
 Charles W. Belsom, Jr.
 Assistant Attorney General

JDC:CWB:Irs
[1] Apparently there was a custom to provide an Executive Pay Plan to qualified executives prior to 1991, but there are no written records of this custom until the 1991 Memorandum.
[2] These memoranda include an October 5, 1993 memorandum from the Personnel Director to Mayor Broussard; an August 2, 1995 memorandum from the Personnel Director to Mayor Broussard; a June 14, 2001 memorandum from the Personnel Director to Mayor Congemi; and a July 1, 2006 memorandum from the Chief Financial Officer to Mayor Muniz. The final change to the EPP is evidenced by a December 6, 2006 memorandum from the Personnel Director to the Chief of Staff.
[3] To the extent that the contributions for the Fire Chief and Chief of Police would have been made to the Firefighters' Retirement System of Louisiana and the Louisiana Municipal Police Employees' Retirement System, respectively, the use of the phrase "Retirement System" shall encompass the Municipal Employees Retirement System of Louisiana, the Firefighters' Retirement System of Louisiana, and the Louisiana Municipal Police Employees' Retirement System, as the context dictates.
[4] The Charter of the City of Kenner provides for five nominal Directors, each of which is the head of his or her respective Department: Director of Finance (§ 4.12), Director of Public Works (§ 4.14), Director of Community Services (§ 4.17), Director of Planning (§ 4.26), and Personnel Director (§ 4.29). It is unclear whether the Fire Chief (§ 4.19) or the Chief of Police (§ 4.23) qualified as "Directors" for purposes of the original EPP, since they are not described as Directors, but they are listed in the Charter in sequence with the nominal Directors and are specified as heads of their respective departments. Id.
[5] Because the memorandum purportedly establishing the EPP was written in 1991, we have examined the Charter in effect in 1991, as well as the current Charter. Unless otherwise noted, the provisions cited herein are the same today as they were in 1991.
[6] By special election held April 1, 2006, the electors of the City approved amendments to the Charter designed to implement a civil service system. Section 3.09 of the Charter was revised to reflect the involvement of the Civil Service Board in determining compensation for classified positions. This revised section retains the requirement that the pay plan for unclassified employees be prepared by the Mayor and submitted to the Council. Charter § 3.09 (effective January 1, 2007). All participants in the EPP and the EPP for Elected Officials are unclassified employees.
[7] As further evidence that any change in compensation for certain offices can only be accomplished through ordinance, the Charter specifies that any ordinance affecting the compensation of the Councilmen, the Mayor, and the Police Chief shall not take effect until after the next regular election of that office. Charter, §§ 2.06, 3.04 5.04.
[8] We have not been asked to render an opinion on any claims that the City may have for recovery of the value of benefits already granted pursuant to the EPP. Nevertheless, we are compelled to advise that it has always been beyond the purview of this office to evaluate any claims that the City may have for recovery of improper benefits. See La.Atty.Gen.Op. No. 04-0161. We would normally advise the City to consult the City Attorneys with respect to these matters. Id. In this case, however, we advise the City to consult with outside counsel in the event that the City Attorneys may have participated in the EPP and therefore may have a conflict of interest. See Rule 1.7(a)(2), Louisiana Rules of Professional Conduct.